**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:                                                Case No. 19-19182

Le Jardin House, LLC
                                                      Chapter 11

       Debtor.

_____/

**DEBTOR'S *EXPEDITED* MOTION FOR ENTRY OF AN ORDER**
**APPROVING PROPOSED SALE OF ESTATE'S INTERESTS IN**
**REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**ENCUMBRANCES, AND INTERESTS AND TO PAY FEES AND**
**COSTS ASSOCIATED WITH SAME, AND FOR PERMISSION TO RECORD**
**CONDOMINIUM DOCUMENTS FREE AND CLEAR FROM ENCUMBRANCES**

**NOTICE TO LIEN, CLAIM AND INTEREST HOLDERS:**

<div style="border:1px solid black; padding:1em;">

**THROUGH THIS MOTION THE DEBTOR SEEKS**
**AUTHORITY TO SELL:**

**APARTMENT NO. 301 AT**
**1150 102ND ST. BAY HARBOR ISLAND, FL 33152**

**FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**ENCUMBRANCES, AND INTERESTS INCLUDING,**
**AMONG OTHERS:**

- **TITAL CAPITAL, LLC**
- **LE JARDIN RESIDENCES LENDERS LLC**
- **LE JARDIN RESIDENCES MANAGER LLC**
- **LE JARDIN CAPITAL LLC**

</div>

**FAILURE TO OBJECT TO THIS MOTION WILL**
**BE DEEMED KNOWING CONSENT TO THE SALES**
**DESCRIBED THROUGH THIS MOTION AND ITS EXHIBITS**

Le Jardin House, LLC, the Chapter 11 debtor and debtor-in-possession herein ("Le Jardin"

or "Debtor"), by and through undersigned counsel, according and pursuant to 11 U.S.C. § 363(b)

and (f), Fed. R. Bankr. P. 2002, 6004 and Local Rule 6004-1, respectfully files this *Motion for Entry of an Order Approving Proposed Sale of Estate's Interest in Real Property Free And Clear Of All Liens, Claims, Encumbrances, And Interests And To Pay Fees And Costs Associated With Same* (the "Motion") requests the entry of an Order approving the sale of the Debtor's Interest in the real property located at 1150 102nd Street, Apt. No. 301, Bay Harbor Island, FL 33152 (the "Property"), to the Buyer[1], pursuant to that certain Purchase Agreement,[2] FREE AND CLEAR OF ALL CLAIMS LIENS AND ENCUMBRANCES and in support thereof states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

2.      Venue of this proceeding and the Motion is proper in this district pursuant to 28 U.S.C. § 1409.

3.      As of the date hereof, no creditors' committee has been appointed in this case. In addition, no trustee or examiner has been appointed.

4.      The statutory bases for the relief sought herein are sections 105(a), 363(b) and (f), and 1107 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Rule 6004-1.

## INTRODUCTION AND BACKGROUND

5.      On July 11, 2019, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the instant bankruptcy case petition (the "Petition Date"). [ECF No. 1].

---

[1] Francisco Gobbi Gallardo Casanova & Ana Lucia Galvao De Franca Casanova and/or assigns (the "Buyer").
[2] The purchase agreement and all addendums thereto is attached hereto as Exhibit "A" (the "Purchase Agreement"). To the extent of any discrepancy between the instant Motion and the Purchase Agreement, the terms of this Motion shall govern.

6.      Le Jardin is the developer of a fantastic 30-unit condominium project that currently has approximately 18 units under contract. The Debtor seeks to close on these sales as soon as possible. The condominium project is located at 1150 102nd Street, Bay Harbor Island, FL 33152 (the "Building").

7.      Most of the condominiums were under contract for sale prior to the Petition Date and the prospective buyers have already paid the deposit amounts for the purchase of the unit and are prepared to close.

8.      Through this Motion, the Debtor seeks to sell its interest in unit no. 301 located at 1150 102nd Street, Bay Harbor Island, FL 33152 (the "Unit").

9.      The Unit was sold prior to the Petition Date, the Buyer is willing to purchase the Unit pursuant to the terms of the Purchase Agreement. The sale will efficiently and expeditiously monetize one of the Debtor's real estate assets for the satisfaction of the creditors' claims.

10.      The Debtor has been unable to close on the sale of the Unit due to a pending action in the circuit court of the Eleventh Judicial Circuit in Miami-Dade County filed by a purported creditor (the "Purported Creditor")[3] asserting an *equitable* lien on the Building and its filing of a lis pendens (the "Lis Pendens") in connection with same (Case no. 17-22215-CA-01) (the "State Court Action").

11.      On April 22, 2019, Debtor filed *Defendant Le Jardin House, LLC's Amended Emergency Motion to Dissolve Lis Pendens or, in the Alternative, to Require That Plaintiff Post a Lis Pendens Bond* (the "Motion to Dissolve Lis Pendens"). Attached hereto as Exhibit "B" is a copy of the Motion to Dissolve Lis Pendens.

---

[3] Le Jardin Residences Lenders LLC ("LJRL") and Le Jardin Residences Manager LLC ("LJRM") are the plaintiffs in the State Court Action. Le Jardin Capital LLC ("LJC") is an intervenor in the State Court Action. Collectively, LJRL, LJRM and LJC shall be referred to herein as the "Purported Creditor".

12.     On April 29, 2019. The Court in the State Court Action entered an Order granting the Motion to Dissolve Lis Pendens. Attached hereto as Exhibit "C" is a copy of the Order granting the Motion to Dissolve Lis Pendens.

13.     On May 7, 2019, a notice of appeal of the Order granting the Motion to Dissolve Lis Pendens was filed.

14.     The appeal is presently pending and the **disputed claim** of Purported Creditor is creating an obstacle to close on the sale of the Unit.

15.     The Building is also subject to a first position mortgage held by Titan Capital, LLC ("Titan"), the main lender for the construction of the Building.

### ***The Property and the Offer***

A.  **1150 102nd Street, Apt. No. 301 Bay Harbor Island, FL 33152**

16.     The Debtor seeks to sell the Unit subject to the Court's approval on the following conditions:

(a) **Property**: Debtor holds a 100% interest in the Property;

(b) **Buyer**: Debtor will proceed to a private sale to the Buyer;

(c) **Purchase Price**: The Buyer has agreed to pay the fair market value of $546,000. The amount paid to date is $273,000 of which, certain funds are presently being held in escrow. Considering closing costs and other fees and costs, the balance due from Buyer is $264,291.

(d) **Notice**: Debtor shall provide 21 days' notice to the creditors and interested parties in connection with the sale;

(e) **Closing Date**: within 30 days of an order approving this Motion or such other time as is agreed to between Buyer and Debtor;

(f) **Payment to Creditors**: 95% of the net sale proceeds after payment of all closing costs shall be paid to Titan at closing, the balance shall be available to the estate for administrative, secured, priority and other unsecured claims (the "Proceeds").

## RELIEF REQUESTED

### *Sale of Property*

17.    The Debtor in possession requests this Court's authority to sell the Unit to the Buyer free and clear of all liens, claims, and encumbrances, with any liens, claims and encumbrances to attach to be satisfied at the closing of the sale or otherwise attach to the Proceeds pursuant to 11 U.S.C. §§ 363(b), (f), (k) and (m).

18.    Pursuant to 11 U.S.C. § 363 the debtor in possession may use, sell, or lease, other than in the ordinary course of business, property of the estate.

19.    The proposed sale to the Buyer, free of the liens and encumbrances, as quickly as possible will maximize the value and benefit to creditors of this estate and minimize the expenses associated therewith.

20.    The sale shall be free and clear of all liens, claims, encumbrances and interests with any such liens, claims, encumbrances and interests to be satisfied at sale closing or otherwise attach to the Proceeds.

### *Sale of Assets Outside Ordinary Course of Business*

21.    Section 363(b) provides, in relevant part, that a trustee (or debtor as made applicable under Section 1303) "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

22.    Sales of this nature are generally approved when it is demonstrated that the sale

constitutes an exercise of sound "business judgment". *See Generally* 3 COLLIER ON BANKRUPTCY ¶ 363.02[1][f] (16th ed. 2011). *See also In re Diplomat Const., Inc.*, 2012 WL 5205792, *(Bankr. N.D. Ga. September 18, 2012) ("[t]he business judgment test is the prevailing rubric to evaluate the proposed transaction under § 363(b)(1)"); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (business judgment); *WBQ P'ship v. Virginia*, 189 B.R. 97 (Bankr. E.D. Va. 1995) (best interest of the estate); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169 (D. Del. 1991); (fair and reasonable price); *In re Phoenix Steel*, 82 B.R. 334 (Bankr. D. Del. 1987) (fair and equitable transaction).

23.    The "sound business judgment" test requires the Debtor to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the Debtor has obtained a fair and reasonable price, and (d) that the decision was made in good faith. *Id.*; *In re Phoenix Steel Corporation*, 82 B.R. 334, 335 (Bankr. D. Del. 1987); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

24.    "Debtors in possession have all of the rights . . . of a trustee serving in a case under chapter 11" including "the exercise of the trustee's rights to use property of the estate under Bankruptcy Code section." *In re Young*, 439 B.R. 211, 219 (Bankr. M.D. Fla. 2010).

25.    Among other things, "[a] Chapter 11 debtor may sell property of the estate free and clear of 'any interest' of another entity in the property, subject to the conditions provided by § 363(f) of the Bankruptcy Code." *In re RMS Titanic, Inc.*, 3:16-BK-2230-PMG, 2016 WL 8262050, at *1 (Bankr. M.D. Fla. July 22, 2016)

### ***Sound Business Reasons Exist to Sell the Property***

26.    There are sound business reasons justifying the sale of the Unit to the Buyer, the most obvious of which is the fact that the sale is the best manner in which to maximize value for

the estate.

27.     The Unit consists of condominium unit 301 situated in the Building.

28.     The Buyer had entered into an agreement with the Debtor for the purchase of the Unit at arm's length prior to the commencement of this bankruptcy proceeding.

29.     Pursuant to such agreement, the Buyer had paid a deposit. Approximately 10% of the purchase price is held in an escrow account pending the closing of the sale of the Unit.

30.     Debtor and Buyer wish to proceed with the sale of the Unit at the agreed price.

31.     The purchase price was achieved through arm's length negotiating and was a product of market tested discussions.

32.     A private sale according to Fed. R. Bankr. P. 6004(f)(1) is the most appropriate method under the circumstances.

33.     As a result, the Debtor has determined that the best way to maximize the value of its assets is to sell the Unit to the Buyer, pursuant to a Section 363 sale, free and clear of all claims, liens and interests, including free of the disputed claim of the Purported Creditor.

34.     Moreover, in the absence of a closed sale of the Unit to the Buyer through a private sale, the Buyer would have a claim against the estate.

35.     The Debtor respectfully submits that all of the factors demonstrating his sound business judgment are met and that the sale should be approved.

### *Fair and Reasonable Price*

36.     The Debtor believes that the Purchase Price is reflective of the market value of the Unit.

37.     Based upon the agreement with the Buyer regarding the Unit, the Debtor estimates the value to be realized by the estate is likely to be in excess of $264,291, which funds would be

made available to pay secured, administrative, priority and other unsecured creditors of the estate.

### *The Sale is in Good Faith*

38.     The Debtor proposes to sell the Unit to the Buyer, who is a third-party that is not an insider of the Debtor.

39.     In light of the foregoing, the sale is being proposed in good faith. *See In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986).

### *Sale Free and Clear of All Liens, Claims and Encumbrances*

40.     The Debtor proposes to sell the Unit free and clear of all liens, claims, and encumbrances pursuant to Section 363(f) of the Bankruptcy Code with all such liens, claims, and encumbrances either being satisfied at closing of the sale or attaching to the net sale Proceeds.

41.     Such a sale is permitted if and when one of the following conditions is met: (1) applicable non-bankruptcy law permits sale of such property free and clear of such a lien, claim, or encumbrance; (2) the entity holding such lien, claim, or encumbrance consents to such a sale; (3) the lien, claim, or encumbrance is less than the aggregate value of all such interests; (4) such interest is in a bona fide dispute; or (5) the entity is compelled in a legal or equitable proceeding to accept a money satisfaction of such interest. *See Generally* 3 COLLIER ON BANKRUPTCY ¶ 363.06 (16th ed. 2011).

42.     In this case, it is anticipated that lender Titan will consent to the sale of the Unit free and clear of all liens, claims and encumbrances pursuant to Section 363(f)(2) and shall be paid a significant portion of the sales price at closing in exchange for a partial release of its mortgage (a complete release against the Unit).

43.     With regard to the Purported Creditor's frivolously asserted equitable lien, the

Debtor seeks to sell the Property free and clear pursuant to Section 363(f)(4).

44.     Section 363(f)(4) permits the Debtor to sell the Unit free of the claim of the Purported Creditor because such claim is the subject of a bona fide dispute.

45.     The Purported Creditor's rights are the subject of a bona fide dispute.

46.     **In fact, the Court presiding over the State Court Action has already dissolved the Lis Pendens by entering its Order granting the Motion to Dissolve Lis Pendens**.

47.     To the extent the Purported Creditor ever succeeds, the value of Debtor's other assets is far greater than the amount claimed by the Purported Creditor. Thus, even if the Unit is sold free and clear of the Purported Creditor's disputed claim, Debtor's other assets are sufficient to satisfy the Purported Creditor's claim in whole.

48.     Accordingly, the Property can be sold free and clear of <u>all</u> liens, claims, and encumbrances pursuant to Section 363(f) of the Bankruptcy Code.

### *<u>The Buyer is a Good Faith Purchaser Under § 363(m) of the Bankruptcy Code</u>*

49.     Section 363(m) of the Bankruptcy Code provides that the reversal or modification on appeal of a transaction authorized under Section 363(b) of the Bankruptcy Code does not affect the validity of the sale to an entity that acquired the property in good faith. *See, e.g.*, *In re Stadium Management Corp.*, 895 F.2d 845 (1st Cir. 1990); *In re Adamson Co., Inc.*, 159 F.3d 896 (4th Cir. 1998).

50.     The Bankruptcy Code does not define the meaning of "good faith purchaser," but courts have adopted a traditional equitable definition: "one who purchases the assets for value, in good faith and without notice of adverse claims." *In re TLFO, LLC*, 572 B.R. 391, 433 (Bankr. S.D. Fla. 2016).

51.     Typically, to establish a lack of good faith, the buyer must be involved in fraud, collusion, or an attempt to take grossly unfair advantage of other bidders. *Id.*

52.     In this case, the Buyer intends to purchase the Unit for its market value. Such value was fully negotiated at arms-length prior to the filing of the bankruptcy case. Debtor and Buyer have not colluded in any way whatsoever. The Purchase Price is a bone fide offer from a third-party buyer.

53.     The Debtor submits that for the reasons set forth above, the Buyer is a good faith purchaser for value that is entitled to the protections afforded under Section 363(m).

### *Debtor Should Be Authorized To Execute Sale Documents*

54.     The Debtor shall cooperate with the Buyer to complete the various documents necessary to consummate the Sale, including a closing statement and trustee's deed.

55.     The Debtor requests that it and the Buyer be authorized to execute any and all documents necessary to consummate the Sale and evidence the conveyance of the Unit to the Buyer.

### *Request For Authorization To Execute Closing Documents And Make Certain Disbursements At Closing*

56.     The Debtor requests authority to execute all documents and pay all expenses necessary to close on the sale of the Property, including, but not limited to, secured creditors, any fees due, documentary stamps and any other items that normally appear on a closing statement, or that will appear on this closing statement (a proposed version of the closing statement will be filed prior to the hearing on the instant motion).

57.     The Debtor seeks authority to sell the Unit without further order of the Court.

### *Request For Authorization To Record the Condominium Documents Free and Clear*

58.     Debtor further requests the Court to enter an order authorizing Debtor to register and file the condominium declaration and all other documents required for the formation of a

condominium in Florida (the "Condominium Documents") for the Building free and clear of all encumbrances.

59.    Debtor has been unable to properly file the Condominium Documents due to the Lis Pendens filed against the Building by the Purported Creditor.

60.    Florida Statute § 718.104, entitled "Creation of Condominium" provides:

> All easements for ingress and egress **shall not be encumbered by any leasehold or lien** other than those on the condominium parcels, unless: (1) Any such lien is subordinate to the rights of unit owners, or (2) The holder of any encumbrance or leasehold of any easement has executed and recorded an agreement that the use-rights of each unit owner will not be terminated as long as the unit owner has not been evicted because of a default under the encumbrance or lease, and the use-rights of any mortgagee of a unit who has acquired title to a unit may not be terminated.

Fla. Stat. § 718.104(4)(n) (emphasis added).

61.    As discussed in detail above, the sale of the units of the Building is central to the Debtor's bankruptcy plan.

62.    To sell the Building's units, Debtor requires to record first the Condominium Documents and such recording has been obstructed by the Lis Pendens.

63.    Therefore, the Debtor seeks the Court's permission to register the Condominium Documents free and clear of all encumbrances before proceeding to the sale of the Building's units.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that the Court enter an Order:

(a)    granting this Motion:

(b)    authorizing the Debtor to sell the Unit free and clear of liens, claims, and encumbrances, pursuant to sections 11 U.S.C. §§ 363(b) and (f);

(c)    finding that the Pending Creditor's claims are subject to a bone fide dispute;

(d)    finding that the Debtor exercised good business judgment in seeking to sell the

11

Unit to the Buyer;

(e)    finding that the sale was negotiated and entered into with a good faith purchaser under 11 U.S.C. § 363(m);

(f)    authorizing the Debtor to disburse the proceeds of the sale at closing as set forth herein;

(g)    finding good cause to hold, and holding that, any order granting this Motion shall survive conversion or dismissal of the Debtors' bankruptcy case and that notwithstanding any conversion or dismissal of the above-captioned bankruptcy case, if any, the sale of the Unit shall be free and clear of all claims liens and encumbrances;

(h)    authorizing the Debtor to register the Condominium Documents free and clear of all encumbrances; and

(i)    granting such other and further relief as is just and proper.

Respectfully submitted this 25th day of July 2019

**EDELBOIM LIEBERMAN**
**REVAH OSHINSKY PLLC**
*Counsel for the Debtor*
20200 W. Dixie Highway, Suite 905
Miami, FL 33180
Telephone: (305) 768-9909
Facsimile: (305) 928-1114
Email: brett@elrolaw.com

*/s/ Brett D. Lieberman*
Brett D. Lieberman
Florida Bar No. 69583

**Exhibit "A"**

## AMENDMENT TO AGREEMENT
*(Credit)*

**THIS AMENDMENT** is made as of the __22__ day of _____May_____, 2015 by and between **Le Jardin House, LLC, a Delaware limited liability company** ("Seller") and _____Francisco Gobbi Gallardo Casanova & Ana Lucia Galvao De Franca Casanova_____ ("Buyer").

R E C I T A L S

A.       Seller and Buyer have entered into that certain Agreement (the "Agreement") for the purchase and sale of **Unit(s)** __301__ (the "Unit") in **LE JARDIN HOUSE CONDOMINIUM** (the "Condominium").

B.       The parties desire to amend the Agreement in certain respects as more particularly set forth below.

**NOW, THEREFORE**, in consideration of Ten and No/100 Dollars ($10.00), the execution and delivery of the Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.       The foregoing recitals are true and correct and are incorporated herein as if repeated at length. Unless the context otherwise requires, all initial capitalized terms used but not defined in this Amendment, shall have the meaning or meanings given to such terms in the Agreement.   This Amendment shall be deemed a part of, but shall take precedence over and supersede any provisions to the contrary contained in, the Agreement.  All references in the Agreement or this Amendment to the "Agreement" shall be deemed to refer to the Agreement as modified by this Amendment, unless the context otherwise requires.

2.       Seller agrees that, at closing, Buyer shall be entitled to a credit against the Purchase Price in the amount of _____Twenty thousand two hundred eighty_____ and 00/100 Dollars ($___20,280___.00) (the "Credit"). Buyer expressly understands and agrees that except only for application towards a timely closing as aforesaid, Buyer shall have no right and/or claim in and to the Credit.

3.       Buyer understands and agrees that the agreements set forth herein may negatively affect the ability and/or the extent to which Buyer can obtain financing for the Unit.  Buyer hereby represents and affirms that Buyer has fully disclosed (or will fully disclose prior to closing) all of the terms of the Agreement (including the terms of this Amendment) to Buyer's lender(s), if any.

4.       Except as may be required to comply with applicable law and/or with court order or court requirement and/or with other mandatory legal process, Buyer hereby covenants and agrees that Buyer shall not, directly or indirectly, disclose the terms of this Amendment, including the provisions hereof, to any other person or entity (other than those which are parties to this Amendment or any of Buyer's legal counsel, consultants, advisors, family members, accountants or auditors and/or actual or potential lenders).  This Paragraph and its requirements shall survive the closing or cancellation or termination of the Agreement and shall terminate only upon closing of the sale of the last of the unsold units in the Condominium.

5.       This Amendment may be executed in any number of counterparts and by the separate parties hereto in separate counterparts, each of which when taken together shall be deemed to be one and the same instrument.   Signatures of the parties hereto on copies of this Amendment transmitted by facsimile machine or other customary electronic transmission shall be deemed originals for all purposes hereunder, and shall be binding upon the parties hereto.

6.       Except as specifically modified hereby, all of the provisions of the Agreement which are not in conflict with the terms of this Amendment shall remain in full force and effect.

*MIA 184536937v1*

*JUNE/02/15*

**EXECUTED** as of the date and year first above written.

*FRANCISCO Bobbi Galhardo Casanova g*

**Buyer:** *ANA LUCIA GALVÃO DE FRANÇA CASANOVA*     **Seller:**

*JUNE/02/15*

Le Jardin House, LLC, a Delaware limited liability company

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

*MIA 184536937v1*

Unit: **301**

LE JARDIN HOUSE CONDOMINIUM

PURCHASE AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

Additionally, under certain circumstances more particularly described in Section 4, and provided that the Seller has posted "Alternative Assurances" with the Division of Florida Condominiums, Timeshares and Mobile Homes, Seller may use all of Buyer's deposits (including those equal to the initial 10% of the Purchase Price, as hereinafter defined).

In this Agreement (including all addenda or amendments hereto, collectively, the "Agreement" or the "Contract"), the term "Buyer" and/or "Purchaser" means or refers to the buyer or buyers listed below who have signed this Agreement. The word "Seller" and/or "Developer" means or refers to Le Jardin House, LLC, a Delaware limited liability company and its successors and/or assigns. If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or, if no definition of such word is given in this Agreement, then it shall have the meaning given to it in the Declaration (as defined in Section 1 of this Agreement).

| | |
|---|---|
| Buyer(s): | Francisco Gobbi Galhardo Casanova & Ana Lucia Galvao De Franca Casanova *AND/OR ASSIGNS* |
| Address: | Alameda Dos Tupiniquins 426 Apt 141 |
| | Sau Paulo, CEP: 04077001 |
| City: | Sau Paulo |
| State: | SP |
| Country: | Brazil |
| Zip Code: | |
| Home Phone: | 551150542436 |
| Office Phone: | |
| Tax I.D. No.: | |
| Fax No.: | |
| E-Mail Address: | Fcasanova@uol.com.br |
| Cellular Phone No.: | 5511999445533 |

**Purchase and Sale.** Buyer agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit **301** (collectively, if more than one, the "Unit") in the proposed LE JARDIN HOUSE CONDOMINIUM (the "Condominium"). The Unit and the Condominium are described in greater detail in this Agreement and the proposed Declaration of Condominium (the "Declaration") included as an exhibit in the Prospectus for the Condominium (together with the exhibits attached to such Prospectus, collectively, the "Condominium Documents"). Buyer acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a buyer, on or before the date of this Agreement.

The total purchase price for the Unit is **$946,000.00** (the "Purchase Price"). Buyer also agrees to pay the fees, costs, reimbursements and other sums required to be paid by Buyer pursuant to Section 11 below. Buyer understands and agrees that the Purchase Price of the Unit is not based solely upon the size of the Unit, but is also based on a number of different factors, including, without limitation, current market conditions, the location of the Unit within the Building, the floor level of the Unit within the Building, ceiling heights within the Unit, and/or sizes of balconies, terraces and/or patios, and/or any other special appurtenant rights attached to the Unit.

RS

Unit: **301**

_Payment of the Purchase Price._  Buyer agrees to make the following payments against the Purchase Price:



| Payment | Due Date | Amount |
|---|---|---|
| Initial 20% Deposit | Upon Buyer's execution of this Agreement | $109,200.00 |
| | _Due March 10, 2015_ | |
| Additional 20% Deposit | No later than 5 days after Seller gives notice to Buyer that Seller has commenced groundbreaking or other site work | $109,200.00 |
| | ~~_Due August 29, 2015_~~ | |
| Additional 10% Deposit | No later than 5 days after Seller gives notice to Buyer that the Building has been topped-off | $54,600.00 |
| | _Due April 30, 2016 when building topped-off_ | |
| Balance | At closing | $273,000.00 |
| Total Purchase Price | | $546,000.00 |

_Two Parking Spaces will be assigned at closing._

Buyer expressly understands and agrees that Seller reserves the right to use Buyer's deposits both up to, and in excess of ten percent (10%) of the Purchase Price of the Unit in order to fund a significant portion of construction and development of the Condominium, all in accordance with the provisions of Section 4 hereof and applicable Florida law.

Deposits may be made by personal check (subject to clearance), cashiers' check or wire transfer of Federal funds. The balance due at closing must be paid by wire transfer of immediately available federal funds only. All payments must be made in United States funds and all checks must be payable on a bank located in the United States. Even though Seller is not obligated to do so, if Seller accepts a deposit from Buyer drawn on a foreign bank and/or payable in a currency other than U.S. currency, Buyer shall be solely responsible for all costs of collection and/or conversion and agrees to pay same to Seller promptly upon demand or, in Seller's sole and absolute discretion, Seller may permit such costs to be charged to Buyer at the time of closing.  If Buyer fails to pay any deposit on time, and Seller (except to accept it on a later date (which Seller is not obligated to do), Buyer will pay a late funding charge equal to interest on such deposit at the then applicable highest lawful rate from the date due until the date received by Seller and cleared by the bank on which it is drawn.  Buyer also agrees to pay all fees, costs, expenses and/or other sums required to be paid by Buyer in this Agreement.  At the present time, the costs for which dollar amounts can be computed are:

(a)    <u>$9,555.00</u>    -    1.75% Development Fee

(b)    <u>$2,016.00</u>    -    Initial Contribution to the Condominium Association

These charges are subject to change as provided in Section 11 of this Agreement and are explained in more detail in that Section, as are other costs which cannot be computed at this time.

_How Buyer Pays._  Buyer understands and agrees that Buyer will be obligated to pay "all cash" at closing and this Agreement is not contingent upon Buyer obtaining financing.  This Agreement and Buyer's obligations under this Agreement to purchase the Unit will not depend on whether or not Buyer qualifies for or obtains a mortgage from any lender.  Buyer will be solely responsible for making Buyer's own financial arrangements.

Although Seller does not have to do so, if Seller agrees to delay closing until Buyer's lender is ready, or to wait for funding from Buyer's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check (which Seller shall have no obligation to do), Buyer agrees to pay Seller a late funding charge equal to interest, at the then highest applicable lawful rate on all funds due Seller, which have not then been paid to Seller (and, with regard to personal checks, which have not then cleared) from the date Seller originally scheduled closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance).  This late funding charge may be estimated and charged by Seller at closing.  Seller's estimate will be adjusted after closing based on actual funding and clearance dates upon either Seller's or Buyer's written request.  Without limiting the generality of Section 30 of this Agreement, the foregoing sentence will survive (continue to be effective after) closing.

_Deposits._  Developer has entered into an escrow agreement (the "Escrow Agreement") with Fidelity National Title Insurance Company (the Escrow Agent"), with offices at 13800 N.W. 14th Street, Suite 190, Sunrise, Florida 33323, for the holding, disbursement and administration of Buyer's deposits, all in accordance with the terms of said Escrow Agreement, this Agreement and the Florida Condominium Act (the "Act").  A copy of the Escrow Agreement is included in the Condominium Documents.  The Escrow Agreement is incorporated into this Agreement as if repeated at length herein, and Buyer agrees that the deposits may be held in any depository which meets the requirements of the Act, including, without limitation, a financial institution chartered and located out of the State of Florida.

Purchase Agreement
- 2 -

_RT_

Unit. 301

Buyer understands and agrees that Seller intends to utilize all of Buyer's deposits in excess of ten percent (10%) of the Purchase Price to fund the construction and development of the Condominium as and to the extent permitted by law. Accordingly, Buyer should expect that its deposits in excess of ten percent (10%) of the Purchase Price will not remain in escrow. In addition to the foregoing, if Seller has obtained or obtains the approval of the Director of the Division of Florida Condominiums, Timeshares and Mobile Homes to provide "Alternative Assurances", as permitted by law, in lieu of holding deposits up to ten percent (10%) of the Purchase Price in escrow, Seller may cause the escrow agent to disburse such deposits to it for all uses permitted by law, all as more particularly described in the escrow agreement. If Seller has obtained such approval as of the date of this Agreement, a copy of the escrow agreement providing the mechanism for such disbursement has been delivered to Buyer. If such approval is obtained after the date of this Agreement, Buyer will be provided with a copy of the escrow agreement, but Buyer agrees that it shall not be deemed a material or adverse change in the offering of the Condominium by reason of the fact that Buyer has already agreed to the use of Buyer's deposits up to ten percent (10%) of the Purchase Price in the manner stated above. Accordingly, Buyer understands and agrees that Seller reserves the right to utilize all of Buyer's deposits (both up to, and in excess of, ten percent (10%) of the Purchase Price) as and to the extent permitted by law. Buyer should expect that its deposits up to, and in excess of ten percent (10%) of the Purchase Price will not remain in escrow.

At closing, all deposits not previously disbursed to Seller will be released to Seller. Except where expressly provided herein to the contrary or otherwise required by law, all interest earned on Buyer's deposits shall accrue solely to the benefit of Seller. Interest shall not be credited against the Purchase Price of the Unit. Buyer further understands and agrees that to the extent that deposit monies are removed from escrow and used as permitted herein, said monies are not available for investment and accordingly no interest shall be earned or deemed to be earned (even if Seller indirectly benefits from the use of said funds). No interest will be assumed to be earned, unless in fact said sums are invested in an interest bearing account and do in fact earn interest. Subject to the terms of Section 13 below, in the event of an uncured default by Buyer and the retention of the Deposit or any portion thereof by Seller, Seller shall also be entitled to retain any interest earned thereon. Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Buyer's deposits, or the portions thereof then being held in escrow, and any interest actually earned on them, may be transferred to the new escrow agent at Seller's direction. If Buyer so requests, Buyer may obtain a receipt for Buyer's deposits from the Escrow Agent.

Buyer's Waiver and Subordination.  Seller may borrow (or may have borrowed) money from lenders (each, a "Developer's Lender") for the acquisition, development, refinancing and/or construction of the Condominium and/or Unit (and any other units owned by Seller, if any). Buyer agrees that any and each Developer's Lender will have, until closing, a mortgage on or other interest in the Unit, and the Condominium (or the real property upon which the Condominium will be created), with greater priority than any rights or interest Buyer may have therein, if any, pursuant to this Agreement or under any principal of equity or otherwise. At closing, Seller shall cause the then applicable mortgages to be released as an encumbrance against the Unit and may use Buyer's closing proceeds for such purpose. Without limiting the generality of the foregoing, Buyer's rights and interest under this Agreement (and the deposits made hereunder) will be subordinate to all mortgages, mezzanine and any other forms of financing (and all modifications made to those mortgages, mezzanine and any other forms of financing) affecting the Unit or the Condominium (or the real property upon which the Condominium is being developed) even if those mortgages, mezzanine and any other forms of financing provided by a Developer's Lender (or modifications) are made or recorded after the date of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, Buyer agrees that neither this Agreement, nor Buyer's making the Deposits (and/or Seller's use of deposits as permitted hereunder), will give Buyer any lien (equitable or otherwise) or claim against the Unit, the Condominium or the real property upon which the Condominium has been (or will be) created and Buyer knowingly, fully and unconditionally waives and releases any right to assert any such lien or claim. Buyer hereby acknowledges and agrees that (i) any and each Developer's Lender is an express third party beneficiary of this Section 5, and (ii) this Section 5 and the rights of any and each Developer's Lender under this Section 5 shall survive any termination, rescission or other voiding of this Agreement, and any default by Developer under this Agreement.

Insulation; Energy Efficiency  Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Unit, the following insulation. (a) Polyguard Insulrap-50 on the Roof, having an R-Value of R-19 and a thickness averaging 3' 2", (b) Fiberglass Batt on the exterior walls, having an R-Value of R-4.8 and a thickness of 3/4" - 4", and (c) Fiberglass Batt on the interior demising walls having an R-Value of 4.8, and of varying thickness This R-value information is based solely on the information given by the appropriate manufacturers and Buyer agrees that Seller is not responsible for the manufacturers' errors. Pursuant to applicable law, Buyer shall have the option to obtain an energy efficiency rating on the Unit being purchased. Buyer hereby releases Seller from any responsibility or liability for the accuracy or level of the rating and Buyer understands and agrees that this Agreement is not contingent upon Buyer's approval of the rating, that the rating is solely for Buyer's own information and that Buyer will pay the total cost of obtaining the rating. All insulation and energy efficiency rating information is subject to Seller's general right, under Sections 14, 27 and 29 below to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

Completion Date; Presale Contingency  Seller estimates that it will substantially complete construction of the Unit, in the manner specified in this Agreement, by approximately June 30, 2017, subject, however, only to delays resulting from "Force Majeure" (the "Outside Date"). The term "Force Majeure" as used in this Agreement shall mean "Acts of God", labor disputes (whether lawful or not), work stoppages, material or labor shortages, restrictions or delays by any governmental or utility authority or any court of law, civil riots, floods or other causes beyond Seller's control.

Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right, in Seller's sole discretion, to rescind this Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least fifty percent (50%) of the Units in the Condominium. Seller must, however, notify Buyer of such a termination within one (1) year following the date of this Agreement (the "Contingency Expiration Date). The foregoing presale contingency is a provision solely for the benefit of Seller, and may be waived unilaterally by Seller. Accordingly, Seller may elect to waive the contingency, whether or not the stated presales threshold has been met. In the event that Seller does elect to proceed without having met the threshold, Buyer will have no right to object thereto and shall remain bound by the terms of this Agreement. This Section shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement. In the event of Seller's termination of this Agreement pursuant to this Section, Buyer shall be entitled to an immediate refund of Buyer's deposits and upon such termination and the return of Buyer's deposits, Seller and Buyer will be fully relieved and released from all obligations and liabilities under and in connection

Purchase Agreement
- 3 -

Unit: **101**

with this Agreement. Seller agrees to use its good faith efforts to meet the foregoing pre-sale requirement, provided, however, that while Seller recognizes that there may be some seasonal variations, Seller may reasonably anticipate sales to occur at a relatively consistent rate throughout the presale contingency period. As such, to the extent that, prior to the Contingency Expiration Date, Seller reasonably believes that the sales will not achieve the presales threshold set forth above, then Seller may terminate this Agreement prior to the Contingency Expiration Date, and such termination shall not be deemed a breach of Seller's obligation to use its good faith efforts to achieve the pre-sale requirement.

Inspection Prior to Closing.  Buyer will be given an opportunity prior to closing, on the date and at the time scheduled by Seller, to inspect the Unit with Seller's representative. At that time, Buyer will sign an inspection statement listing any alleged defects in workmanship or materials (only within the boundaries of the Unit, itself) which Buyer discovers.  If any item listed is actually defective in workmanship or materials (keeping in mind the construction standards applicable in Miami-Dade County, Florida for properties of similar type, style and age), Seller shall, subject to the other provisions hereof, be obligated to repair those items at its cost within a reasonable period of time after closing, but Seller's obligation to do so will not be grounds for deferring the closing, nor for imposing any condition on closing.  **No escrows or holdbacks of closing funds will be permitted.**  Buyer understands and agrees that Seller's obligation to repair items in the Unit noted during the pre-closing inspection shall automatically terminate (with Seller having no further obligations for such items) upon the earlier of: (i) the date that Buyer obtains a permit for construction and/or improvement of the Unit, or (ii) the date that Buyer commences construction and/or improvement of the Unit, whether or not a permit has been obtained. If Buyer fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Seller will not be obligated to reschedule an inspection prior to closing and Buyer shall be deemed to have accepted the Unit in its AS-IS condition (subject only to any warranty obligations of Seller, to the extent applicable and not then expired).

From and after the closing, Buyer hereby grants Seller and its agents access to the Unit at reasonable times during normal business hours to complete any necessary repairs to the Unit.  If Buyer cannot be present at the time such work is to be performed to facilitate completion of such work, Buyer hereby authorizes Seller, its agents, employees contractors and sub-contractors to enter the Unit for such purposes using a master key or a key maintained by the Association. If Buyer cannot or elects not to be present at the time that Seller performs any such work, Buyer hereby waives and releases Seller (its partners, members, managers, contractors, sub-contractors, employees, agents, designees and assigns) from any and all claims that Buyer may have against Seller (its partners, members, managers, contractors, sub-contractors, employees, agents, designees and assigns) relating to damage to or theft of property from the Unit that is not due to the negligence or intentional act of Seller or its partners, members, contractors, subcontractors, employees, agents, designees and/or assigns.  Buyer acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives.  Buyer agrees not to interfere with or interrupt any workers at the site of the Unit.  No personal inspections (other than the one preceding inspection referred to above) will be permitted.  Buyer may not commence any work on the Unit, other than prepaid options or extras that Seller agrees in writing to provide, until after closing.  Buyer recognizes that Seller is not obligated to agree to provide extras or options.  Buyer can examine Seller's Plans and Specifications at Seller's business office, located on site or otherwise at a location identified by the Seller, during regular business hours by making an appointment to do so in advance.

The provisions of this Section shall survive closing.

Closing Date.  Buyer understands and agrees that Seller has the right to schedule the date, time and place for closing, which shall in no event be scheduled later than six (6) months following the Outside Date.  Before Seller can require Buyer to close, however, two things must be done:

    (a)    Seller must record the Declaration and related documents in the Miami-Dade County public records, and

    (b)    Seller must obtain a temporary, partial or permanent certificate of occupancy for or covering the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be occupied), but, subject and subordinate to the provisions of Sections 0 and 32 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements and other portions of the Condominium Property need not then have certificates of occupancy, nor be completed.  Seller does, however, agree to complete those amenities within a reasonable period of time following closing, provided, however, that no closing shall occur until the certificate of substantial completion described in Section 718.104(4)(e), F.S. shall have first been recorded.  Seller does however, agree to provide or complete, within a reasonable period of time following closing, those roads and facilities for water, sewer, gas, electricity and recreational amenities, which Seller or its agents have represented Seller will provide or complete, or Seller has committed to provide or complete in accordance with the terms of the Condominium Documents.

Buyer will be given at least ten (10) days' notice of the date, time and place of closing.  Seller is authorized to postpone the closing for any reason and Buyer will close on the new date, time and place specified in a notice of postponement (as long as at least three (3) days' notice of the new date, time and place is given).  A change of time or place of closing only (one not involving a change of date) will not require any additional notice period.  Any formal notice of closing, postponement or rescheduling may be given by Seller orally, by telephone, e-mail, facsimile, mail or other reasonable means of communication at Seller's option.  All of those notices will be sent or directed to the address, or given by use of the information specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any change prior to the date the notice is given.  These notices will be effective on the date given or mailed (as appropriate).  An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.  After the notice is given or mailed, and if requested in writing by Buyer, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions.  This written confirmation is given merely as a courtesy and is not the formal notice to close.  Accordingly, it does not need to be received by any particular date prior to closing.  Buyer agrees, however, to follow all instructions given in any formal notice and written confirmation. If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of mailing address, e-mail address, phone number or telecopy number, because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other reason, Buyer will not be relieved of Buyer's obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date.  If Seller agrees to reschedule closing at Buyer's request, or if Buyer is a corporation or other entity and Buyer fails to produce the necessary documentation Seller requests and, as a result, closing is delayed, or if closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at

<div align="center">Purchase Agreement<br>- 2 -</div>



R T

Unit: **301**

closing a late funding charge equal to interest, at the then highest applicable lawful rate, on that portion of the Purchase Price not then paid to Seller (and cleared), from the date Seller originally scheduled closing to the date of actual closing. Buyer agrees that the late funding charge is appropriate in order to cover, among other things, Seller's administrative and other expenses resulting from a delay in closing. **Buyer understands that Seller is not required to reschedule or to permit a delay in closing at Buyer's request.**

      **Closing.** The term "closing" refers to the time when Seller delivers the deed to the Unit to Buyer and ownership changes hands. Buyer's ownership is referred to as "title". Seller promises that the title Buyer will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below and the other provisions of this Agreement). Notwithstanding that Buyer is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price and the transaction is governed by the Real Estate Settlement and Procedures Act (RESPA), Buyer shall have the right to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, or Buyer may elect to have Seller's closing agent issue the title insurance commitment and policy in accordance with terms set forth in Section 11 below. In the event that the transaction is governed by RESPA and Buyer elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller: (i) Buyer shall provide Seller with written notice of same within twenty (20) days following Buyer's execution of this Agreement (unless the estimated closing date is less than twenty (20) days following the date hereof, in which event, such notice must be given simultaneously with Buyer's execution of this Agreement); (ii) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Buyer; and (iii) Buyer shall, no later than five (5) business days prior to closing (or on the date of this Agreement, if the closing is scheduled less than five (5) business days following the date of this Agreement (the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Buyer), provided that if Buyer fails to give Seller written notice of defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

      Unless Buyer has elected, in the manner specified above and if permitted to do so under the conditions set forth above, to obtain a title insurance commitment from its own sources (to the extent that the transaction is governed by RESPA), Buyer agrees that Seller's designee shall act as closing agent and shall issue the title insurance commitment (and subsequent title insurance policy), which shall be paid for by Seller as provided hereafter. Buyer will receive from Seller two (2) documents at closing which Buyer agrees to accept as proof that Buyer's title is as represented above:

            **A written commitment.** from a title insurance company licensed in Florida, agreeing to issue a policy insuring title  or the policy itself. This commitment (or policy) will list any exceptions to title. Permitted exceptions (exceptions which Buyer agrees to take title subject to) are:

         (i)      Liability for all taxes or assessments affecting the Unit, which are not yet due and payable, starting the year Buyer receives title and continuing thereafter;

         (ii)     All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements now or hereafter recorded in the public records, which may include, without limitation, zoning restrictions, property use limitations and obligations, easements (rights-of-way) and agreements relating to telephone lines, water and sewer lines, storm water management and other utilities;

         (iii)    The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded, now or at any time after the date of this Agreement, in the public records;

         (iv)    Any open Notice of Commencement related to Seller's construction or development of, among other things, the Condominium (although Seller will provide an unsecured indemnification to the title insurer selected by Seller, on a form reasonably acceptable to Seller, to induce the title insurer selected by Seller to insure Buyer's title without exception for unfiled construction liens relating to the Notice of Commencement). To the extent that this transaction is governed by RESPA and Buyer elects to obtain title services through its own sources rather than from Seller's designee, Seller will only provide the title insurer selected by Buyer the same form of unsecured indemnification described above and Buyer assumes all obligations to obtain a title insurance commitment (and subsequent title insurance policy) without exception for unfiled construction liens, or otherwise. Buyer agrees to take title subject to the Notice of Commencement and any related unfiled liens;

         (v)     Pending governmental liens as of closing (Seller will be responsible, however, for certified governmental liens or special assessment liens as of closing, provided, however, that to the extent that any such certified liens are then due or are payable in installments, Seller shall only be responsible for those payments and/or installments due prior to closing, and Buyer hereby assumes all payments and/or installments coming due after closing);

         (vi)    All standard printed exceptions contained in an ALTA Owner's title insurance policy issued in Miami-Dade County, Florida; and

         (vii)   Any matters not listed above as long as title insurance coverage is available for these matters from a nationally recognized title insurer.

            **A Special Warranty Deed.** At closing, Seller promises to give Buyer a special warranty deed to the Unit. The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above.

      To the extent that the transaction is governed by RESPA and in the event Buyer elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, Buyer will receive the special warranty deed described in Section 10(a)(i) above which Buyer agrees to accept as proof that Buyer's title is as represented

Unit: 301

above. Buyer will also receive at closing a bill of sale for any appliances included in the Unit, and Seller's form of owner's ("no lien") affidavit, closing agreement, FIRPTA (non-foreign) affidavit and an assignment of any appurtenances to the Unit, if any, as described herein. When Buyer receives the special warranty deed at closing, Buyer will sign Seller's closing agreement, a settlement statement and all papers that Seller deems reasonably necessary or appropriate for transactions of this nature. If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title. If Seller cannot, after making reasonable efforts to do so (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments) correct the title defects, Buyer will have two options:

(i)      Buyer can accept title in the condition Seller offers it (with defects) and pay the full Purchase Price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit. Buyer will not make any claims against Seller because of the defects; or

(ii)     Buyer can cancel this Agreement and receive a full refund of Buyer's deposits.

At the same time Buyer receives the special warranty deed, Buyer agrees to pay the balance of the Purchase Price and any additional amounts owed under this Agreement. Seller has no obligation to accept funds other than as set forth in Section 3 above. Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Buyer agrees Seller may unilaterally record in the Public Records of the County). This Section shall survive (continue to be effective after) closing.

11.     Additional Fees and Costs. Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing. These include:

(a)      A "development fee" equal to one and three quarters percent (1.75%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price);

(b)      In the event of increases in either the recording fees imposed by the County, the documentary stamp tax rates or the promulgated title insurance premiums, subsequent to the date of this Agreement, or in the event of the imposition of any surcharge or any new governmental tax or charge on deeds or conveyances, Buyer agrees to pay all such increases, surcharges or new taxes or charges, in addition to the development fee;

(c)      To the extent that the transaction is governed by RESPA and Buyer has elected, in the manner provided herein, to obtain a title insurance commitment and policy from its own sources, or to the extent that Seller otherwise allows Buyer to utilize its own title agent (which Seller has no obligation to do if the transaction is not governed by RESPA) all costs in connection with title search, title review and the premium for the title insurance commitment and title insurance policy at the minimum promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home credits, if any);

(d)      A working capital contribution in an amount equal to the aggregate of twice the regular monthly assessment for the Unit due to the Association, as determined at the time of closing, and which contribution is payable directly to the Association to provide it with funds. This contribution may be used by the Association for any purpose, including, payment of ordinary Common Expenses or operating costs, and will not be credited against regular assessments or charges. The amount of the contribution may change, however, if the monthly assessments change prior to closing (see Section 17). To the extent that Seller elects to fund deficits as provided in the Declaration, no portion of the contribution shall be used for payment of Common Expenses prior to the expiration of the period during which Seller is excused from payment of assessments;

(e)      A reimbursement to Seller for any utility, cable or interactive communication deposits or hookup fees, and/or governmental impact fees, which Seller may have advanced prior to closing for the Unit or applicable to the Unit. The amount of these charges is now unknown;

(f)      Any charge due for any options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Buyer and Seller;

(g)      Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating the closing with Buyer and/or Buyer's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others. The amount of these charges is now unknown;

(h)      All fees and charges payable to any attorney selected by Buyer to represent Buyer. The amount of any such charges is now unknown; and

The late funding charges provided for elsewhere in this Agreement, or any increases in items (i), (ii) or (iii) below, as provided below. The amount of any such charges is now unknown.

Seller agrees to pay the following closing costs at closing:

(i)      the costs of officially recording the deed in the Public Records of the County (presently, recording fees are $10.00 for the first page of an instrument and $8.50 for each additional page);

(ii)     documentary stamp taxes payable in connection with the deed conveying the Unit to Buyer (presently, documentary stamp taxes are $.60 for each $100.00 of consideration); and

(iii)    the title insurance premium for any title insurance policy issued by Seller's closing agent. If the transaction is covered by RESPA and Buyer elects to have its own title agent issue the title insurance policy, or for any other reason, Buyer does not obtain a title policy from Seller's closing agent, Buyer shall be obligated for the payment of the title insurance premium charged by Buyer's title insurance agent, as well as any other title search fees incurred by Buyer's title agent, as set forth above.



RT

Unit: 301

Buyer understands and agrees that Seller may utilize the Development Fee for payment of the closing costs for which Seller is obligated, but that the balance of such "Development Fee" shall be retained by Seller to provide additional revenue and to offset certain of its construction and development expenses, including without limitation, certain of Seller's administration expenses and Seller's attorneys' fees in connection with the development of the Condominium. Accordingly, Buyer understands and agrees that the Development Fee is not for payment of closing costs or settlement services (other than to the extent expressly provided above), but rather represents additional funds to Seller which are principally intended to provide additional revenue and to cover various out-of-pocket and internal costs and expenses of Seller associated with the development of the Condominium.

If Buyer obtains a loan for any portion of the Purchase Price, Buyer will be obligated to pay any loan fees, closing costs, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Buyer a mortgage, if applicable. Additionally, if Buyer obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Buyer agrees to pay, in addition to any other sums described in this Agreement, such closing agent an aggregate sum equal to $975.00, for a simultaneously issued mortgagee's title insurance policy, the agent's title examination, title searching and closing services related to acting as "loan closing agent". In addition to that sum, Buyer shall be obligated to pay the premiums (at promulgated rate) for any title endorsements requested by Buyer's lender. If the transaction is governed by RESPA, Buyer shall not be obligated to use Seller's closing agent as Buyer's loan closing agent, and if Buyer elects to use another agent, Buyer will not be obligated to pay to Seller's closing agent the amounts described in this paragraph (although Buyer will be obligated to pay to Buyer's loan closing agent such fees and expenses as are agreed to by Buyer and that closing agent). Notwithstanding any of the references in this paragraph to Buyer obtaining a loan, nothing herein shall be deemed to make this Agreement, or the Buyer's obligations under this Agreement, conditional or contingent, in any manner, on the Buyer obtaining a loan to finance any portion of the Purchase Price; it being the agreement of the Buyer that the Buyer shall be obligated to close "all cash".

Current expenses of the Unit (for example, taxes and governmental assessments, levies and/or use fees and current monthly assessments of the Association) are current service fees imposed by governmental authority) will be prorated between Buyer and Seller as of the date of closing. Additionally, at closing, Buyer shall be obligated to prepay the next month's maintenance assessment to the Association. This prepayment is in addition to Buyer's obligation to pay the working capital contribution, as described above. If taxes for the year of closing are assessed on the Condominium as a whole, Buyer shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) from the date of closing through the end of the applicable calendar year of closing. Buyer should understand that during the year in which the Declaration of Condominium is recorded, it is likely that real property taxes may be assessed as a whole against the entire property comprising the Condominium (rather than on a unit-by-unit basis, which is how the Condominium will be assessed during all years following the year during which the Declaration is recorded). As such, if Buyer is closing in the calendar year during which the Declaration is recorded, Buyer should anticipate having to pay to Seller, at closing, the estimated prorated amount of real property taxes attributable to the Unit for the period from the date of closing through December 31 of the year of closing; and based upon the perceived value of the Unit, such amount will, in all likelihood, be a substantial sum. If taxes for the year of closing are assessed on a unit-by-unit basis, Buyer and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Buyer responsible for paying the full amount of the tax bill and Seller reimbursing Buyer for Seller's prorated share of those taxes. Buyer agrees that Seller's prorated share of the taxes due as of closing need not be paid to Buyer, however until the actual tax bill is presented to Seller; and any proration made based on an estimate of the current year's taxes shall be subject to reproration upon request of either party; provided, however, that any request for reproration is made within six (6) months following the issuance of the actual tax bill for the Unit (it being assumed, for purposes hereof, that tax bills are issued on November 1 of each tax year) or the date of the final determination of any property tax appeal (if the taxes for the year of proration have been appealed). No request for proration made beyond the six (6) month period shall be valid or enforceable. In addition, Buyer shall pay, or reimburse Seller if then paid, for any interim proprietary and/or general service fees imposed by any governmental municipality or governmental authority having jurisdiction over the Unit. This Subsection shall survive (continue to be effective after) closing.

12.    Adjustments with the Association.  Buyer understands that Seller may advance money to the Association to permit it to pay for certain of its expenses (for example, but without limitation, insurance premiums, Common Element utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the Association and other similar expenses). Seller is entitled to be reimbursed by the Association for all of these sums advanced by Seller, to the extent in excess of Seller's assessment obligations (and/or deficit funding obligations, if any). To the extent that Seller is entitled to reimbursement, the Association will reimburse Seller out of regular assessments paid by Buyer and other owners as those contributions and assessments are collected, or as otherwise requested by Seller. Seller also, at its election, may receive reimbursement (to the extent that it is otherwise entitled to reimbursement) for these payments by way of a credit against any sums it may become obligated to pay to the Association.

Default.

(a)    If Buyer fails to perform any of Buyer's obligations under this Agreement (including making scheduled deposits and other payments) Buyer will be in "default". If Buyer is still in default ten (10) days after Seller sends Buyer written notice thereof, Seller shall be entitled to the remedies provided herein. If, however, Buyer's default is in failing to close on the scheduled date, then, in addition to all other remedies provided herein (if any), Seller can cancel this Agreement without giving Buyer any prior (or subsequent) notification or opportunity to close at a later date.

(b)    Upon Buyer's default (and the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Seller can terminate this Agreement and resell the Unit for a higher or lower price. Buyer understands and agrees that Buyer's default will damage Seller, in part because of the following: (i) Seller has taken the Unit off the market for Buyer, (ii) Seller has relied upon use of Buyer's deposits to fund the construction of the Condominium and to the extent permitted by law, (iii) Seller has committed or expended funds, arranged labor and made purchases or commitments for materials, finishes and/or appliances in reliance upon being able to use Buyer's deposits, and Buyer's fulfillment of its obligations under this Agreement, and (iv) Seller has spent money on sales, advertising, promotion and construction of





Unit: 301

the Condominium Property and has incurred other costs incident to this sale.  As compensation for this damage, in the event Seller cancels this Agreement because of Buyer's default, Buyer and Seller agree, that Seller's sole remedy, shall be to recover actual damages, which are to be determined solely in accordance with the following methodology (the "Damage Determination Methodology"), which Buyer agrees is a fair and reasonable method for the calculation of Seller's damages.  Until such time as the damages are capable of calculation pursuant to the Damage Determination Methodology (which Buyer understands and agrees may take several months or perhaps longer) Buyer agrees that any deposits or advance payments then being held in escrow shall remain in escrow and that any deposits and/or advance payments utilized in construction or development of the Condominium or properly withdrawn from escrow, need not be refunded to Buyer or returned to escrow  Buyer's agreement to the Damage Determination Methodology and the potential delay in calculation is a material consideration for Seller's willingness to enter into this Agreement.  Buyer agrees that the Damage Determination Methodology is a fair and reasonable method for determination of Seller's damages, notwithstanding any delays associated with calculation and that this is not a liquidated damages provision.  The "Damage Determination Methodology" shall be the sum of the following, with calculation to occur, at the request of either party, within thirty (30) days following Seller's closing on the sale of the Unit to another party (the "Resale"):

(i)      The amount by which the Purchase Price on the Resale (the "Resale Purchase Price") is less than the Purchase Price under this Agreement.  To the extent that the Resale Purchase Price exceeds the Purchase Price under this Agreement, for purposes of the Damage Determination Methodology, same shall result in a negative number that will offset the other considerations in determining damages.  In the event that closing on the Resale has not occurred on or before one (1) year following the date that Seller receives temporary certificate of occupancy ("TCO") for the Unit, the Resale Purchase Price shall be deemed to be the same as the Purchase Price under this Agreement.  Seller agrees to use its good faith efforts to resell the Unit at such price, on such conditions and otherwise in a like manner as that of other similarly situated units being offered for sale by the Seller in the Condominium. Plus.

(ii)     An amount equal to ten percent (10%) of the Resale Purchase Price, which is deemed to be a fair and accurate representation of the brokerage and marketing expenses likely to be incurred by Seller in marketing the Unit for resale; Plus

(iii)    An amount equal to interest on any unfunded deposits as of the date of Buyer's default, calculated at the rate of eight percent (8%) per annum on the unfunded portion of such deposits, from the date of Buyer's default until the date Seller receives a TCO for the Unit, and thereafter, an amount equal to interest on the unfunded portion of the Purchase Price of the Unit calculated at the rate of eight  percent (8%) per annum on the unfunded portion of the Purchase Price of the Unit, from the date Seller receives the TCO for the Unit (as hereinafter defined, the "TCO Date"), until the date of closing on the Resale, as applicable.  In the event that closing on the Resale has not occurred on or before 1 year following the TCO Date, the date of closing on the Resale shall be deemed to be 1 year following the TCO Date.  For purposes hereof, the TCO Date shall be the earlier of: (i) the date that Seller actually receives a TCO for the Unit or (ii) the Outside Date as defined in Section 7 above.

Notwithstanding anything to the contrary, Seller's Damages shall never be deemed to be less than zero (which could result if the Resale Purchase Price were greater than the Purchase Price).

Upon determination of Seller's damages in accordance with the Damage Determination Methodology ("Seller's Damages")  (a) if Seller's Damages are less than the amount of Buyer's deposits and other prepayments, then, Seller shall, within thirty (30) business days following the calculation of Seller's Damages, return to Buyer the amount by which Buyer's deposits and prepayments exceeded Seller's Damages, or (b) if Seller's Damages are greater than the amount of Buyer's deposits and other prepayments, then Buyer shall, within thirty (30) business days following the calculation of Seller's Damages, pay to Seller the amount by which Seller's Damages exceeded Buyer's deposits and prepayments.  In either event, Buyer shall simultaneously deliver to Seller a full and complete release from any and all claims and/or liabilities arising out of, or in connection with, this Agreement.

Based upon the Damage Determination Methodology, Buyer understands and agrees that damages are incapable of calculation until the closing on the Resale has occurred (or is deemed to have occurred as stated above).  As such, in the event of an uncured default by Buyer, Buyer agrees not to commence any legal or other action against Seller to attempt to obtain a refund of any deposits or other advance payments until such time as the Resale has occurred (or is deemed to have occurred).  While this may result in an inconvenience to Buyer, Buyer understands and agrees that the Damage Determination Methodology is only applicable if and when Buyer defaults.

By initialing here, Buyer understands the unique Damage Determination Methodology agreed upon, that it may result in delays in calculation and that it is nonetheless a fair and reasonable method for determination of Seller's Damages resulting from Buyer's default.

(c)      If Seller fails to perform any of Seller's obligations under this Agreement, Seller will be in "default".  If Seller is still in default ten (10) days after Buyer sends Seller notice thereof (or such longer time as may reasonably be necessary to cure the default if same cannot be reasonably cured within ten (10) days), Buyer may pursue such rights as may be available in equity and/or under applicable law and Seller is entitled to defend itself to the maximum lawful extent.

The provisions of this Section 13 will survive (continue to be effective after) termination of this Agreement and/or closing.

Purchase Agreement
- 8 -

Unit: 301

14.   Construction Specifications.  The Unit and the Condominium will be constructed in substantial accordance with the plans and specifications therefor kept in Seller's construction office, as such plans and specifications are amended from time to time.  Seller may make such changes in the plans and specifications that it deems appropriate at any time, to accommodate its in the field construction needs (as more fully discussed in this Section 14) and in response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers or Seller's design professionals and/or contractors or suppliers.  Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications".  Without limiting Seller's general right to make changes, Buyer specifically agrees that the changes described above and changes in the location of utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and compenents, lighting fixtures and electric panel boxes, may be made by Seller in its discretion.  In furtherance of the understanding and agreement stated above, Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs.  These changes and adjustments are essential in order to permit all components of the Unit and the Building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium.  Buyer further acknowledges and agrees that (i) the plans and specifications for the Unit and the Condominium on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications; and (ii) because of the day-to-day nature of the changes described in this Section 14, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities).  As a result of the foregoing, Buyer and Seller both acknowledge and agree that the Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities.  Without limiting the generality of Section 29, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications.  Seller has not given and Buyer has not relied on or bargained for any such warranties.  In furtherance of the foregoing, in the event of any conflict between the actual construction of the Unit and/or the Building, and that which is set forth on the plans, Buyer agrees that the actual construction shall prevail and to accept the Unit and Building as actually constructed (in lieu of what is set forth on the plans).

   Buyer understands and agrees that in designing the Condominium, the stairwells within the Condominium Property are intended primarily for ingress and egress in the event of emergency and, as such may be constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells.  Similarly, the garage and utility pipes serving the Condominium are intended primarily for functional purposes, and as such may be left unfinished without regard to the aesthetic appearance of same.  Further, Buyer hereby acknowledges and agrees that the potential for sound and/or odor transmission in a multi-story building is always a possibility and that noises and/or odors from nearby units and/or mechanical equipment can often be detected in other units.  Without limiting the generality of Section 29, Seller does not make any representation or warranty as to the level of sound and/or odor transmission between and among Units, vibrations from HVAC and/or mechanical equipment and the other portions of the Condominium Property, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from vibration, sound and/or odor transmission.  Lastly, Buyer understands and agrees that there are various methods for calculating the square footage of a Unit and that depending on the method of calculation, actual square footage of the Unit may be more or less than Buyer had anticipated.  Accordingly, during the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit.  The agreements and waivers of Buyer contained in this Section 14 will survive (continue to be effective after) the closing.

   Certain Items and Materials.  Buyer understands and agrees that the Unit is to be delivered at closing in "decorator-ready condition".  "Decorator ready condition" generally means that the Unit will be delivered in a condition where it is ready for decoration and finish by the Buyer after closing.  Buyer understands and agrees that certain items such as the following, which may be seen in model apartments (if any), brochures and/or illustrations, are not included with the sale of the Unit:  wall coverings (including paint other than base primer), accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, sound systems, kitchen accessories, linens, window shades, security systems, certain built-in fixtures, cabinetry, carpets or other floor coverings and colors, wood trim, other upgraded items, balcony treatments (e.g., tile, stone, marble, brick, chattahoochee, scored concrete or wood trim), barbecues, planters, window screens, landscaping and any other items of this nature which may be added or deleted by Seller from time to time.  This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed in model apartments (if any) or shown in illustrations strictly for the purpose of decoration and example only.  Items such as these will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller.  Certain of these items may not even be available.  In the event that Seller does provide any of these or other items, however, Buyer agrees to accept them, although not requested by Buyer, as long as Buyer is not required to pay for such items.  There is no obligation for Seller to provide models, but if so provided, the foregoing disclaimers will apply.  Buyer further understands and agrees that certain items, if included with the Unit, such as tile, marble, stone, granite, cabinets, wood, stain, grout, wall and ceiling textures, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any).  If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, or if Seller elects to omit certain items, Seller may modify the list of standard features or make substitutions for equipment, material, appliances, brands, models, etc., with items which in Seller's opinion are of equal or better quality (regardless of cost).  Buyer also understands and agrees that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any).  Buyer recognizes that certain colors as shown in displays or in the models, including, but not limited to, stone, marble, granite, cabinetry, carpeting and wood stain, will weather and fade and may not be duplicated precisely.  If Seller allows Buyer to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within fourteen (14) days after the date the list of selections (if any) is made available to Buyer.  If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood that the choices will be made by Seller in Seller's sole discretion.  The agreements and waivers of Buyer contained in this Section C will survive (continue to be effective after) closing.

   Litigation.  In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorneys', paralegals' and para-professionals' fees and court costs at all trial and appellate levels.  In addition, in

Unit: 301

the event of any litigation between the parties related to this Purchase Agreement (i) the parties shall and hereby submit to the personal jurisdiction of the state and federal courts of the State of Florida and (ii) venue shall be laid exclusively in Miami-Dade County, Florida.

SELLER AND BUYER AGREE THAT NEITHER SELLER, BUYER, NOR ANY ASSIGNEE, SUCCESSOR, HEIR, OR LEGAL REPRESENTATIVE OF SELLER OR BUYER (ALL OF WHOM ARE HEREINAFTER REFERRED TO AS THE "PARTIES") SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDINGS, COUNTERCLAIM, OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE CONDOMINIUM DOCUMENTS, ANY RULES OR REGULATIONS OF THE ASSOCIATION, OR ANY INSTRUMENT EVIDENCING OR RELATING TO ANY OF THE FOREGOING, OR ANY DOCUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY ACTIONS, DEALINGS OR RELATIONSHIP BETWEEN OR AMONG THE PARTIES, OR ANY OF THEM. NONE OF THE PARTIES WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY NEGOTIATED BY THE PARTIES AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. SELLER HAS NOT IN ANY WAY INDICATED THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

This Section will survive (continue to be effective after) any termination of this Agreement, but shall otherwise be deemed merged into the deed at closing.

Maintenance Fee.  Buyer understands and agrees that the Estimated Operating Budget for the Association (the "Budget") contained in the Condominium Documents provides only an estimate of what it will cost to run the Association during the period of time stated in the Budget. The Budget is not guaranteed to accurately predict actual expenditures.  Actual expenditures may vary based upon a number of factors, many of which are out of Seller's control.  These factors include, without limitation, changes in costs, environmental considerations and the effects of natural disasters.  In making a decision to acquire the Unit, Buyer should factor in these potential increases in the Budget that may occur prior to closing, and after (and the resultant increases in the assessment amounts). While in Seller's opinion such changes do not constitute a material modification of the Condominium Documents in a manner which is adverse to the Buyer, nothing herein shall be deemed to deny Buyer the rights as set forth in Section 25 below.  It is intended that the Seller, as the sole Unit Owner upon the formation of the Condominium, will vote not to provide any reserves for the initial year of the Association.  Thereafter, on an annual basis, a majority of the Association's members (which may include the Seller/Developer during the second fiscal year of the Association) may vote to continue not to provide any reserves.  If an election is, in fact, made to waive reserves, the assessments per unit payable to the Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - Without Reserves".  If no such election is made, the assessments per Unit payable to the Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - With Reserves".

Condominium Association.  This Agreement is also Buyer's application for membership in the Association, which membership shall automatically take effect at closing.  At that time, Buyer agrees to accept all of the liabilities and obligations of membership.

Seller's Use of the Condominium Property.  As long as Seller owns a unit or units and is offering same for sale in the ordinary course of business, it and its agents are hereby given full right and authority to place and maintain on, in and about the Condominium Property and/or Association Property (excluding the Unit after closing) model units, sales and leasing offices, administrative offices, signs and lighting related to construction and sales promotion purposes, for such period of time, at such locations and in such forms as shall be determined by Seller in its sole and absolute discretion.  Seller, its employees, agents contractors, sub-contractors and prospective buyers are also hereby given, for construction and sales promotion purposes, the right of entry upon, ingress to, egress from and other use of the Condominium and/or Association Property (excluding the Unit after closing), and the right to restrict and regulate access to the Common Elements and/or Association Property, subject to Buyer's reasonable access to and from the Unit after closing, for the purposes of completing construction of the Common Elements, Association Property and/or other units within the Condominium.   Seller's salespeople can show units, the Association Property and/or the Common Elements, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell, resell, finance or lease units or other portions of any improvements to be constructed upon the Condominium Property or develop and manage the Condominium Property and/or Association Property and/or to provide management and administration and/or financial services, but Seller's use of the Condominium Property and/or Association Property must be reasonable, and cannot unreasonably interfere with Buyer's use and enjoyment of the Unit. This Section will survive (continue to be effective after) closing.

Sales Commissions.  Seller will pay all sales commissions due its in-house sales personnel and/or exclusive listing agent and the co-broker, if any, identified on the last page of this Agreement (if such space is left blank, it shall mean that Seller has not agreed to pay any co-broker and that Buyer represents that there is no co-broker who can claim by, through or under Buyer), provided that such co-broker has properly registered with Seller as a participating co-broker.  Seller has no responsibility to pay any sales commissions to any other broker or sales agent with whom Buyer has dealt.  Buyer will be solely responsible to pay any such other brokers.  By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement), nor has the sale been procured by any real estate broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement).  Buyer will defend, indemnify and hold Seller harmless for and from any such person or company claiming otherwise.  Buyer's indemnity and agreement to hold Seller harmless includes, without limitation, Buyer's obligation to pay or reimburse Seller for all commissions, damages and other sums for which Seller may be held liable and all attorneys' fees and court costs actually incurred by Seller (including those for appeals), regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately wins or loses. This Section 20 will survive (continue to be effective after) closing and any termination of this Agreement.

Notices.  Whenever Buyer is required or desires to give notice to Seller, the notice must be in writing and it must be sent by (i) certified mail, postage prepaid, with a return receipt requested (ii) hand delivery or (iii) a recognized overnight courier service (i.e., Fed Ex, United Parcel Service, etc.), to Seller at Le Jardin House, LLC, 1111 Kane Concourse, Bay Harbor Islands, Florida 33154 Attn: Le Jardin House Project Manager or to such other address as Seller may otherwise direct.

Purchase Agreement
- 10

Unit: 301

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Buyer, the notice must be given either in person, by telephone or in writing and, if in writing, it must be sent either by: (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Buyer may be sent by regular air mail); (ii) facsimile transmission if Buyer has indicated a telecopy number on Page 1 of this Agreement; (iii) electronic transmission, if Buyer has indicated an email address on Page 1 of this Agreement, or (iv) hand delivery or by recognized overnight courier service (i.e., Fed Ex, Express Mail, United Parcel Service, etc.), to the address for Buyer set forth on Page 1 of this Agreement.

A change of address notice is effective when it is received. As to other notices, notices delivered by certified mail, shall be deemed received by Buyer on the date that the postal service first attempts delivery of the notice at the Buyer's address (regardless of whether delivery is accepted). Notices delivered by facsimile transmission shall be deemed received on the date that Seller gets confirmation (from the sending machine) that the facsimile was transmitted to the receiving facsimile number. Notices delivered by electronic transmission (e-mail) shall be deemed received by Buyer on the date sent by Seller. Notices delivered by hand delivery or overnight courier service shall be deemed received on the date that the delivery service or overnight courier service first attempts delivery of the notice at the Buyer's address (regardless of whether delivery is accepted). All permitted non-written notices to Buyer are deemed received on the date given by Seller.

Transfer or Assignment. Buyer shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable). To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever including, without limitation, charging an assignment or transfer fee and requiring full disclosure of any beneficial owners of any proposed assignee that is an entity. Any such assignee that is consented to by Seller must fully assume all of the obligations of Buyer hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. If Buyer is a corporation, partnership, other business entity, trustee or nominee, a direct or indirect transfer of any stock, voting interest, partnership interest, equity, beneficial or principal interest in Buyer will constitute an assignment of this Agreement requiring prior written consent by Seller. Without limiting the generality of the foregoing, Buyer shall not, prior to closing on title to the Unit, unless first obtaining the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion) advertise, market and/or list the Unit for lease, sale or resale, whether by placing an advertisement, listing the Unit with a broker, posting signs at the Unit or at the Condominium, allowing the Unit to be listed for sale on the internet or the Multiple Listing Service or otherwise. Notwithstanding any permitted assignment or transfer of any interest in this Agreement and/or the Unit, nothing shall relieve or release Buyer from any obligations or liabilities under the Agreement.

Others Bound by this Agreement. If Buyer dies or in any way loses legal control of Buyer's affairs, this Agreement will bind Buyer's heirs and personal representatives. If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving such interest. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity resulting from operation of law. If more than one person signs this Agreement as Buyer, each will be equally liable, on a joint and several basis, for full performance of all Buyer's duties and obligations under this Agreement and Seller can enforce this Agreement against either as individuals or together.

Public Records. Buyer authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Miami-Dade County, Florida. Without this Agreement, nor any notice or memorandum thereof (nor any Lis Pendens), may be recorded by Buyer. Buyer further agrees not to seek to impose any type of lien or other claim upon the Unit or all or any portion of the Condominium, equitable or otherwise, and any right to impose or seek any such lien or other claim is hereby knowingly, fully and unconditionally waived by Buyer.

Buyer's Right to Cancel

THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING. FIGURES CONTAINED IN ANY BUDGET DELIVERED TO THE BUYER PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER. ACTUAL COSTS OF SUCH ITEMS MAY EXCEED THE ESTIMATED COSTS. SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.

If Buyer does not cancel this Agreement during this 15-day period in the manner set forth above, it means that Buyer ratifies this Agreement and the Condominium Documents and Buyer agrees that their provisions are fair and reasonable in Buyer's opinion.

Florida Law: Severability. Any disputes that develop under this Agreement and any issues that arise regarding the entering into, validity and/or execution of this Agreement will be settled according to Florida law. If any part of this Agreement violates a provision of applicable law, the applicable law will control. In such case, however, the rest of this Agreement (not in violation) will remain in force.

Without limiting the generality of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement,



Unit: 301

or this Agreement in its entirety), and then are to be enforced as so modified.  If the unenforceable part or parts cannot be so modified, such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced, to the maximum extent possible, strictly in accordance with its terms) can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Buyer's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void.  Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right).

Changes.  Seller may make changes in the Condominium Documents in its sole discretion by providing Buyer with all such amendments that are made, provided that, as to these changes, Buyer will have fifteen (15) days from the date of receipt of such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Buyer in which to cancel this Agreement (by delivering written notice to Seller of such cancellation) and receive a refund of any deposits with applicable interest earned, if any.  Buyer will not be permitted to prevent Seller from making any change it wishes in its sole discretion.

If Buyer has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Buyer, Buyer's failure to request cancellation in writing within the 15-day period will mean that Buyer accepts the change and waives irrevocably Buyer's right so to cancel.  All rights of cancellation will terminate, if not sooner, then absolutely, at closing.

Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (i) substitute the final legal descriptions and asbuilt surveys for the proposed legal descriptions and plot plans contained in the Condominium Documents even though changes occur in the permitting stage and during construction, and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall Common Elements in any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected and/or (iii) update the Condominium Documents to reflect any changes in the Florida Condominium Act adopted by the Legislature (and/or changes to the Administrative Rules adopted by the Division) after the date of this Agreement.  Buyer understands and agrees that Seller has no control over changes to the Act and/or Administrative Rules and as such, that Seller shall have no liability with respect to its incorporation of these changes.

The provisions of this Section 27 will survive (continue to be effective after) closing.

Nearby Activities and Views.  Buyer understands and agrees that for some time in the future Buyer may be disturbed by the noise, commotion and other unpleasant effects of the nearby activities and that Buyer may be impeded in using portions of the Condominium Property by any one or more of those activities.  Demolition or construction of buildings and other structures within the immediate area or within the view lines of any particular Unit or of any part of the Condominium (the "Views") may block, obstruct, shadow or otherwise affect Views, which may currently be visible from the Unit or from the Condominium.

As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter, except as is set forth herein or in the Condominium Documents.  Buyer hereby agrees to release Seller, its partners and/or members and its and their officers, members, directors and employees and every affiliate and person related or affiliated in any way with any of them (collectively, "Seller's Affiliates") from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including, without limitation, any imposed by statute, ordinance or arbitration and appellate proceedings, related to or arising out of any claim against the Seller or Seller's Affiliates related to Views or the disruption, noise, commotion, and other unpleasant effects of nearby development or construction, or from any other inconveniences, disturbances, obligations and/or liabilities resulting therefrom.

The provisions of this Section 28 shall survive (continue to be effective after) closing.

Disclaimer of Implied Warranties.  All manufacturers' warranties will be passed through to Buyer at closing.  At closing, Buyer will receive the statutory warranties imposed by the Florida Condominium Act (to the extent applicable and not yet expired). **To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Florida Condominium Act to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character, including, without limitation, any imposed by statute, ordinance or common law, are specifically disclaimed. Without limiting the generality of the foregoing, Seller hereby disclaims any and all express or implied warranties as to design, construction, view, wind, sound and/or odor transmission, furnishing and equipping of the Condominium Property, the existence of molds, mildew, spores, fungi and/or other toxins within the Condominium Property, except only those set forth in Section 718.203 of the Act, to the extent applicable and to the extent that same have not expired by their terms.** Seller has not given and Buyer has not relied on or bargained for any such warranties. As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above). Buyer acknowledges and agrees that Seller does not guarantee, warrant or otherwise assure, and expressly disclaims, any right to views and/or natural light.

Additionally, properties in South Florida are subject to tropical conditions, which may include sudden, heavy rain storms, high blustery winds, hurricanes and/or flooding.  These conditions may be extreme, creating sometimes unpleasant or uncomfortable conditions or even unsafe conditions, and can be expected to be more extreme at properties like the Condominium.  At certain times, the conditions may be such where use and enjoyment of outdoor amenities such as the pool or pool deck and/or other areas may be unsafe and/or not comfortable or recommended for

use and/or occupancy. These conditions are to be expected at properties near the water. Buyer understands and agrees to accept these risks and conditions and to assume all liabilities associated with same. By executing and delivering this Agreement and closing, Buyer shall be deemed to have released and indemnified Seller, Seller's Affiliates and Seller's third party consultants, including without limitation, Seller's architect, contractors and engineers, from and against any and all liability or claims resulting from all matters disclosed or disclaimed in this Section, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, inconvenience and/or personal injury and death to, or suffered by, Buyer or any of Buyer's Guests as defined below and any other person or any pets). Buyer understands and agrees that neither Seller, Seller's Affiliates, nor any of Seller's third party consultants, including without limitation, Seller's architect, contractors and engineers, shall be responsible for any of the conditions described above, and Seller hereby disclaims any responsibility for same which may be experienced by Buyer, its pets, its family members and/or its or their guests, tenants and/or invitees (collectively "Buyer's Guests").

Further, given the climate and humid conditions in South Florida, molds, mildew, spores, fungi and/or other toxins may exist and/or develop within the Unit and/or the Condominium Property. Buyer is hereby advised that certain molds, mildew, spores, fungi and/or other toxins may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk. By executing and delivering this Agreement and closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, spores, fungi and/or other toxins and to have released and indemnified Seller, Seller's Affiliates and Seller's third party consultants, including without limitation, Seller's architect, contractors and engineers, from and against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, the inability to occupy the Unit, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities and/or personal injury and death to or suffered by Buyer and/or any of Buyer's Guests and any other person or any pets). Without limiting the generality of the foregoing, leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of molds, mildew, fungus or spores. Buyer understands and agrees that neither Seller, Seller's Affiliates, nor any of Seller's third party consultants, including without limitation, Seller's architect, contractors and engineers, shall be responsible, and Seller hereby disclaims any responsibility for any illness or allergic reactions which may be experienced by Buyer, and/or Buyer's Guests as a result of molds, mildew, fungus or spores. It is solely the Buyer's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination.

This Section will survive (continue to be effective after) closing

Return of Condominium Documents. If this Agreement is canceled for any reason, Buyer will return to Seller all of the Condominium Documents delivered to him or her in the same condition received, reasonable wear and tear excepted. If Buyer fails to return the Condominium Documents, Buyer agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

Survival. Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed. All other provisions shall be deemed merged into the deed.

32.    Substantial Completion. The Unit will not be considered complete for purposes of this Agreement unless the Unit (and such portion of the Building intended to be used exclusively by Buyer) is physically habitable and usable for the purpose for which the Unit was purchased. The Unit (and such portion of the Building intended to be used exclusively by Buyer) will be considered so useable if (i) the Unit is ready for occupancy and has all necessary and customary utilities extended to it and (ii) access to the Unit from a readily accessible entrance to the Building is complete or substantially complete. The issuance of a temporary, partial or permanent certificate of occupancy for or covering the Unit from the proper governmental agency shall be deemed conclusive evidence that the Unit is considered complete for purposes of this Agreement. Other units (and other portions of the Building, Common Elements and/or recreational facilities) may not necessarily be complete and/or useable. As to any roads, sewers, water, gas or electric service or recreational amenities represented by Seller or its agents to be provided or completed by Seller, Seller agrees to provide or complete same within a reasonable period of time

Disclosures. Buyer is hereby advised as follows:

RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Seller does not conduct radon testing with respect to the Units or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium.

(b)    ANY CLAIMS FOR CONSTRUCTION DEFECTS ARE SUBJECT TO THE NOTICE AND CURE PROVISIONS OF CHAPTER 558, FLORIDA STATUTES.

(c)    BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE.    A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION

(d)    FIGURES CONTAINED IN ANY BUDGET DELIVERED TO THE BUYER PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER.    ACTUAL COSTS OF SUCH ITEMS MAY

Unit 301

EXCEED THE ESTIMATED COSTS. SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.

(e) Pursuant to the mandates of Miami-Dade County Ordinance 93-21 and the provisions of Chapter 11C of the Metropolitan Dade County Code, to the extent applicable, Buyer is hereby advised that:

> THIS HOME OR STRUCTURE IS LOCATED IN A COASTAL HIGH HAZARD AREA. IF THIS HOME OR STRUCTURE IS BELOW THE APPLICABLE FLOOD ELEVATION LEVEL AND IS SUBSTANTIALLY DAMAGED OR SUBSTANTIALLY IMPROVED, AS DEFINED IN CHAPTER 11C OF THE METROPOLITAN MIAMI-DADE COUNTY CODE, IT MAY, AMONG OTHER THINGS, BE REQUIRED TO BE RAISED TO THE APPLICABLE FLOOD ELEVATION LEVEL; and

> THIS HOME OR STRUCTURE IS LOCATED IN A SPECIAL FLOOD HAZARD AREA. IF THIS HOME OR STRUCTURE IS BELOW THE APPLICABLE FLOOD ELEVATION LEVEL AND IS SUBSTANTIALLY DAMAGED OR SUBSTANTIALLY IMPROVED, AS DEFINED IN CHAPTER 11C OF THE METROPOLITAN MIAMI-DADE COUNTY CODE, IT MAY, AMONG OTHER THINGS, BE REQUIRED TO BE RAISED TO THE APPLICABLE FLOOD ELEVATION LEVEL.

(f) Buyer further agrees not to seek to impose any type of lien or other claim upon the Unit, equitable or otherwise, and any right to impose or seek any such lien or other claim is hereby knowingly, fully and unconditionally waived by Buyer.

(g) Buyer expressly understands and agrees that Seller intends to use Buyer's deposits (both up to (provided that Seller has placed Alternative Assurances approved by the Division), and in excess of 10% of the Purchase Price of the Unit) in order to fund a significant portion of construction and development of the Condominium, all in accordance with the provisions of Section 4 hereof and applicable Florida law.

(h) In accordance with the ordinances of Miami-Dade County, Buyer is hereby advised that the Unit is or may be submetered, that bills for water service will or may be issued on a submetered basis, and that bills shall not include charges for water service for common areas and facilities (the charges for water service for common areas and facilities instead are included in Common Expenses and paid for through Assessments). Buyer acknowledges receipt of the County Consumer Service Department's Remetering Bill of Rights pamphlet.

Buyer's Initials to acknowledge the foregoing disclosure:

34. Representations and Confirmations. Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any monetary or financial advantages.

Buyer acknowledges, warrants, represents and agrees that no statements or representations have been made by Seller, Seller's Affiliates, or any of its agents, employees or representatives with respect to (i) the ability or willingness of Seller or Seller's Affiliates to assist Buyer in renting or selling the Unit (except only in response to a direct inquiry from Buyer), (ii) the economic or tax benefits to be derived from the managerial efforts of a third party as a result of renting the Unit or other units, or (iii) the economic or tax benefits to be derived from ownership of the Unit.

Buyer acknowledges, warrants, represents and agrees that no such representations, including representations as to the ability or willingness of Seller or Seller's Affiliates to assist Buyer in financing, renting or selling the Unit, have been made by Seller, Seller's Affiliates, or any of its agents, employees or representatives. Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit. Neither Seller, Seller's Affiliates, nor anyone working by, through or under Seller, has made any statement or suggestion that Buyer would not be obligated to fully comply with the terms of this Agreement and to close on the purchase of the Unit. Further, Buyer understands and agrees that neither Seller, Seller's Affiliates, nor any brokerage company, on site sales personnel and/or other persons working by, through or under Seller, are under any obligation whatsoever to assist Buyer with any resale of the Unit.

**Buyer acknowledges, warrants, represents and agrees that Buyer has not relied upon any verbal representations or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) potential appreciation in or resale value of the Unit, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the Condominium, (d) disturbance from nearby properties, (e) disturbance from air or vehicular traffic or (f) any particular design professional, including, without limitation, any decorator or architect (it being understood that the Seller reserves the right to change and/or replace any and all members of its design team at any time, in Seller's discretion).**

The provisions of this Section shall survive the closing.

Offer. The submission by Seller of this Agreement to Buyer for examination does not constitute an offer by Seller to Buyer, or a reservation of or option for any Unit in the Condominium. This Agreement shall not become binding until executed and delivered by both Buyer and Seller. Upon execution by Seller, an executed copy of this Agreement shall be sent to Buyer or Seller shall otherwise demonstrate its acceptance of Buyer's offer, otherwise the offer shall be considered rejected.

Interpretation. Notwithstanding that this Agreement was prepared by one party hereto, it shall not be construed more strongly against or more favorably for either party; it being known that both parties have had equal bargaining power, have been represented (or have had the opportunity to be represented) by their own independent counsel and have equal business acumen such that any rule of construction that a document is to be construed against the drafting party shall not be applicable. Buyer acknowledges and agrees that Buyer has had ample opportunity to inspect other similar condominiums and

Unit: 301

condominium documents, that Seller has clearly disclosed to Buyer the right to cancel this Agreement for any reason whatsoever, including any dissatisfaction Buyer may have with this Agreement or the Condominium Documents, within fifteen (15) days of the date Buyer executes this Agreement or has received the Condominium Documents, whichever is later, and that although Seller's sales agents are not authorized to change the form of this Agreement, they have strict instructions from Seller to communicate any of Buyer's requests for such changes to Seller's management, which has given Buyer the opportunity to discuss and negotiate such changes.

37.    Risk of Loss.  Risk of loss to the Unit or Condominium by fire, natural disaster, acts of terrorism or other casualty until the closing is assumed by the Seller.  Risk of loss to the Unit by fire, natural disaster, acts of terrorism or other casualty from and after closing is assumed by the Buyer.  Buyer should be aware that the Unit and Condominium, however constructed, may be subject to damage or destruction by naturally occurring events such as hurricanes, erosion and/or sinkholes.

Miscellaneous.  The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here.  When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Buyer and Seller.  Buyer acknowledges that the primary inducement for Buyer to purchase under this Agreement is the Unit, itself, and not the recreational amenities and other Common Elements.  Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.  The performance of all obligations by Buyer on the precise times stated in this Agreement is of absolute importance and failure of Buyer to so perform on time is a default, time being of the essence as to all of Buyer's obligations hereunder.  Buyer understands and agrees that Buyer is not acquiring rights in and/or to the name of the Condominium and/or the Condominium Association and that the name of the Condominium is not a material consideration in connection with Buyer's purchase of the Unit.  Additionally, the name of the Condominium and/or the Condominium Association may be changed by the Seller, in its sole discretion.  If Buyer tenders a check to Seller as all or a portion of the Purchase Price or Buyer's deposits under the Agreement (which Seller has no obligation to accept), which check was drawn on the account of a party other than Buyer (a "Third Party Check"), Buyer represents and warrants to Seller, in order to induce Seller to accept the Third Party Check, that: (i) the party issuing the Third Party Check is not the subject of a bankruptcy case, receivership or insolvency proceeding, (ii) the Third Party Check is being given on behalf of Buyer as reasonably equivalent value for services performed and/or products delivered to such third party from Buyer and (iii) the party issuing the Third Party Check has no right, title or interest in and to the Unit and/or the Agreement and/or any portion of the Deposits.  Notwithstanding the foregoing or anything contained to the contrary in the Agreement, Buyer shall remain responsible for full payment of the Purchase Price at closing, including without limitation, the Deposits.  Seller shall have the right to litigate ad valorem tax matters, impact charges, service fees and interim and/or special assessments concerning the Unit, the Common Elements or any other portion of the Condominium Property for prior years and/or the year of closing.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and said counterparts shall constitute but one and the same instrument.  Signatures of the parties hereto on copies of this Agreement transmitted by facsimile machine or over the Internet, shall be deemed original for all purposes hereunder, and shall be binding upon the parties hereto.  The counterparts of this Agreement and all ancillary documents executed or delivered in connection with this Agreement may be executed and signed by electronic signature by any of the parties to this Agreement, and delivered by electronic or digital communications to any other party to this Agreement, and the receiving party may rely on the receipt of such document so executed and delivered by electronic or digital communications signed by electronic signature as if the original has been received.  For the purposes of this Agreement, electronic signature means, without limitation, an electronic act or acknowledgement (e.g., clicking an "I Accept" or similar button), sound, symbol (digitized signature block), or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.  Executive Order 13224 restricts activities with entities, countries and persons (specifically designated nationals) set forth by the Office of Foreign Asset Control ("OFAC").  In order to check the OFAC list, Buyer must provide Seller with a government-issued identification card (for example, a driver's license, passport, or resident alien card).  To the extent Buyer's name (or to the extent Buyer is a corporation or other entity, any person or entity constituting a part of Buyer) matches a name or entity on any such OFAC list or publication, the transactions with Buyer contemplated under or in connection with this Agreement will be immediately suspended, and Buyer shall be reported as instructed by OFAC.  Seller reserves the right to establish prices for units in the Condominium.  Seller may, in Seller's sole discretion, increase or decrease the price or price per square foot for any unit, or any offered option, if any, at any time, or offer incentives for the sale of units.  Seller makes no representations or warranties that the price for the Unit or options in the Unit will be increased or decreased for other buyers of identical or similar units or options.  Seller also makes no representations or warranties that changes made or options, extras or upgrades chosen by Buyer will or will not increase or decrease the market value of the Unit, and Buyer understands and agrees that such upgrades and options, if any, may not increase the market value of the Unit.

Entire Agreement.  This Agreement is the entire agreement for sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by both Buyer and Seller which specifically states that it is amending this Agreement.  This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, brochures, artist renderings and other promotional materials contained in the sales office and/or the model suite are conceptual and are for promotional purposes only and may not be relied upon.  **Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement or the Condominium Documents, are void and have no effect.  Buyer acknowledges and agrees that Buyer has not relied on them.  Notwithstanding the foregoing, Seller shall not be excused from any liability under, or compliance with, the provisions of Section 718.506, Florida Statutes.**

Unit: 301

**GENERAL INFORMATION:**

Co-Broker Information:      (See Section 20 above; if the space for Co-Broker's name is left blank, it shall mean that Seller has not agreed to pay any co-broker)

| | | |
|---|---|---|
| Co-Broker's Name: | Algebra Investments & Realty Corp. | |
| Co-Broker's Sales | Maria Sandra Soler | |
| Co-Broker's | 3363 NE 163rd St #505 | |
| | North Miami Beach, FL 33160 | |

| Phone | | Fax | |
|---|---|---|---|
| E-Mail | msnasandra@a | Licens | 3123936 |

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

_SELLER:_                                                    _BUYER:_

Le Jardin House, LLC, a Delaware limited
liability company

By: _____                Name: _____
     Authorized Representative                            Francisco Gobbi Galhardo Casanova

                                                            Name: _____
                                                                    Ana Lucia Galvao De Franca Casanova

Date of Acceptance: 02/25/15          Date of Signature: 02/22/2015

RECEIPT FOR CONDOMINIUM DOCUMENTS

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, made available for inspection:

**Name of Condominium:**        LE JARDIN HOUSE CONDOMINIUM

**Address of Condominium:**        1150-1160 102nd Street, Bay Harbor Islands, Florida 33154

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If an item does not apply, place "N/A" in the column.

| Document | Received | By Alternative Media |
|---|---|---|
| Prospectus Text | N/A | ✓ |
| Declaration of Condominium | N/A | ✓ |
| Articles of Incorporation | N/A | ✓ |
| Bylaws | N/A | ✓ |
| Estimated Operating Budget | N/A | ✓ |
| Form of Agreement for Sale or Lease | N/A | ✓ |
| Rules or Regulation | N/A | N/A |
| Covenants and Restrictions | N/A | N/A |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More Than One Year | N/A | N/A |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominiums (See §718.503(1)(b)7, F.S. and §718.504, F.S.) | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sales Brochure | N/A | N/A |
| Phase Development Description (See §718.503(1)(b)11, F.S. and §718.504, F.S.) | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums (See §718.503(1)(b)8, F.S. and §718.504, F.S.) | N/A | N/A |
| Description of Management for Single Management of Multiple Condominiums (See §718.503(1)(b)5, F.S. and §718.504, F.S.) | N/A | N/A |
| Conversion Inspection Report | N/A | N/A |
| Conversion Termite Inspection Report | N/A | N/A |
| Document | Received | By Alternative Media |
| Plot Plan | N/A | ✓ |
| Floor Plan | N/A | ✓ |
| Survey of Land and Graphic Description of Improvements | N/A | ✓ |
| Frequently Asked Questions and Answers Sheet | N/A | ✓ |
| Evidence of Interest in the Condominium Property | N/A | ✓ |
| Development Plan Approval | N/A | N/A |

RY

| | Received | Made Available | |
|---|---|---|---|
| Executed Escrow Agreement | N/A | | ✓ |
| Alternative Media Disclosure Statement (See Rule 61B-17.011, F.A.C.) | N/A | | N/A |

| Document | Received | Made Available | By Alternative Media |
|---|---|---|---|
| Plans and Specifications | N/A | ✓ | N/A |

THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER.  THIS AGREEMENT IS ALSO VOIDABLE BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER.  ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT.  BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED.  BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.

Executed this 22 day of FEBRUARY 2015

Purchaser or Lessee

Name FRANCISCO GOBBI CHALHARDO CASANOVA

Name: ANA LUCIA GALVAO DE FRANÇA CASANOVA

RF

Additional Disclosure

Accompanying

Purchase Agreement



Carlos Alvarez, Mayor

Consumer Services Department
Office of the Director
140 West Flagler Street, Suite 903
Miami, Florida 33130-1561
T 305-375-1250   F 305-372-6368
consumer@miamidade.gov
www.miamidade.gov/csd

miamidade.gov

## REMETERING CONSUMER BILL OF RIGHTS

Water remetering is permitted in Miami-Dade County. The intent of this program is to conserve water, assist property owners in detecting and correcting water leaks in a timely manner, and ensure that you do not unfairly pay for water used by others.

Miami-Dade County Ordinance 96-137 permits owners of condominiums, apartment buildings, commercial complexes, mobile home parks, etc. to install a submeter in each individual's unit. As a result, you pay for your own water service consumption in addition to your monthly rental or maintenance fee.

This is a summary of your rights and responsibilities under the rules:

**Bills in General:**
Your bill may only cover water and sewer from within your unit, as measured by your unit's water meter. Water and sewer consumption for common areas and facilities such as community pools are the responsibility of the property owner. The property owner cannot disconnect your water service and cannot bill you for usage of water service by previous resident.

**What your bill must show:**
Your bill must show all of the following information:

1. The date and meter reading of the period for which the bill is rendered.

2. The prior and current meter readings.

3. The total gallon or CCF of water service being billed and how it has been computed.

4. The total amount due for water service used and applicable taxes.

5. The name and address of the resident to whom the bill is issued.

6. The name of the company providing you with the bill and the address and telephone number of the contact person you can call in case of a billing dispute.

7. The bill due date.

8. The name, address and telephone number of the party to whom payment is to be made.

9. If your bill has been estimated, it must state that it has been estimated.

10. The telephone number of the Miami-Dade Consumer Services Department (CSD). (305) 375-3677, and a statement that indicates the CSD may be contacted if you are unable to settle your dispute with your property owner or remeterer.

**Due Date:**

You must be given at least 15 days to pay your bill. If your due date falls on a holiday or weekend, you may make your payment on the next business day after the due date.

**Late Payment Charge:**

If you pay your bill late, you may be charged a late fee not to exceed 10% of your total bill. It must be disclosed on your bill.

**Additional Charges on Your Bill:**

You cannot be billed any charges other than water, sewer, applicable taxes, and late fee charges provided that it is disclosed in the bill.

**Disputes:**

If a dispute arises concerning your bill or water service, you must inform your property owner, in writing, the specific reason for the dispute. Your property owner is required to investigate promptly and report the results to you in writing within 30 days.

**Overbilling or under billing:**

If your bill is found to be in error, a corrected bill must be issued and the property owner or remeterer must adjust your bill. If you were undercharged, you may be billed for the amount under billed for a period not to exceed six (6) months. If the under billing is $25 or more, the property owner must offer you a deferred payment plan option for the same length of time as that of the under billing.

**Test:**

If you feel that your water meter is defective, your property owner must, upon a reasonable written request from you, test the accuracy of your submeter. If you wish, you may watch the test, or you can send a representative. The test must be made during normal business hours (normally, Monday through Friday between the hours of 8:00 AM to 5:00 PM). If the meter test indicates that your water meter is accurate, you may be charged a reasonable testing and plumbing charge. If your meter is defective, no charge can be made to you for making the test.

**Records:**

Your property owner is required to keep the following records for 12 months:
1) the bill from WASD;
2) calculation for the billing;
3) all meter readings, resident billings and meter test results for the individual units.

A COPY OF THE WATER REMETERING ORDINANCE 96-137 CAN BE OBTAINED FOR A NOMINAL FEE FROM THE MIAMI-DADE COUNTY CONSUMER SERVICES

FOR ASSISTANCE AND/OR COMPLAINT RESOLUTION CALL THE MIAMI-DADE CONSUMER SERVICES DEPARTMENT AT (305) 375-3677

RT

LE JARDIN HOUSE CONDOMINIUM
*Alternative Media Disclosure Statement*

Francisco Casanova and Ana Casanova                    ('Purchaser'), the purchaser of Unit ___301___
in Le Jardin House Condominium ('Condominium') from Le Jardin House, LLC, a Delaware limited liability compa-
ny ('Developer'), has elected to receive the Prospectus for the Condominium and the other documents required by
Section 718.503, Florida Statutes, to be furnished by a developer to a buyer or lessee (collectively, the Condominium
Documents') on either a thumb drive, media card, tablet, or other portable computing device, application, CD, DVD, via
e-mail or other electronic medium ('Alternative Media'), rather than receiving paper copies of same.

Developer has given Purchaser the option of receiving the Condominium Documents on paper, but by sign-
ing below, has elected to receive the Condominium Documents by Alternative Media. The Purchaser should not select
Alternative Media unless the Purchaser will have the means to read the Condominium Documents before the expira-
tion of the 15-day cancellation period described in the purchase agreement.

The system requirements necessary to view the Condominium Documents by Alternative Media are as fol-
lows:

Operating System: Microsoft Windows XP or higher, including Vista, 7 or 8 or Apple's Mac OS x10.5 or high-
er

Memory: 256 MB of Ram
Hard Drive: 60 MB of available hard-disk space.
Processor Speed: Intel Core Duo 1.83 GHz or higher
Software: Adobe Reader 5.0 or higher.
USB Port – USB 1.1 or higher
Display Resolution – 1024 x 768 pixels or higher
By signing below, Purchaser hereby elects to receive the Condominium Documents by Alternative Media.

Name: *FRANCISCO BOBBI GALHARDO CASANOVA*
Date: _____02/22/2015_____

Name: *ANA LUCIA GALVÃO DE FRANÇA Casanova*
Date: ____02/23/2015____

MIA 184277384v1

# Exhibit "B"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

Case No.:  2017-022215-CA-10

LE JARDIN RESIDENCES LENDERS, LLC,
LE JARDIN RESIDENCES MANAGER, LLC,

        Plaintiffs,

v.

LE JARDIN HOUSE, LLC,
MARIA KUZMINA and NADEZDA DANILOCHKINA,

        Defendants.

_____/

### DEFENDANT LE JARDIN HOUSE, LLC'S AMENDED EMERGENCY MOTION TO DISSOLVE LIS PENDENS OR, IN THE ALTERNATIVE, TO REQUIRE THAT PLAINTIFF POST A LIS PENDENS BOND

Defendant Le Jardin House, LLC ("Defendant") files this Emergency Amended Motion to Dissolve a Notice of Lis Pendens recorded by Plaintiff Le Jardin Residences Lenders, LLC ("Plaintiff") on the basis that (1) there is no *fair nexus* between the interest claimed by Plaintiff in the Defendant's property and the dispute embodied in this action which affords Plaintiff the right to record the Notice of Lis Pendens ("Lis Pendens") and (2) even if Plaintiff had the right to record the Lis Pendens, Plaintiff has failed to, and cannot, show good cause as to why its previously expired Lis Pendens should be revived and extended. In support hereof, Defendant states as follows:

1.    Defendant files, and seeks hearing on, this motion on an emergency basis due to the pending closings on twenty (20) contracts for the sale of condominium units in that certain project known as Le Jardin Residences Condominium located at 1150 and 1160 101 Street, Bay Harbor Islands in Miami-Dade County. It is currently anticipated that a Temporary Certificate of

**NELSON MULLINS BROAD AND CASSEL**
One North Clematis Street, Suite 500 West Palm Beach, Florida 33401 561.832.3300

Occupancy for the project will be issued on Friday, April 26, 2019. Upon issuance of such certificate, closings are scheduled to commence on Monday, April 29, 2019, and continue for approximately two (2) weeks until complete. These closings represent $15,542,266 in gross income to Defendant, against which it has previously received $5,678,969 in deposits paid. *See* Affidavit of Tim Lobanov attached hereto as Exhibit "A".

2.      At closing, Defendant is required to deliver to each condominium purchaser (1) a written commitment to issue a policy insuring title, or a title insurance policy itself, with only limited exceptions to title permitted (such exceptions not including Plaintiff's recorded Lis Pendens), and (2) a Special Warranty Deed subject only to the permitted exceptions. *See* Exhibit "A", pg 5, to Lobanov Affidavit.

3.      If Defendant cannot deliver the quality of title required by each purchase agreement, which Plaintiff's Lis Pendens will preclude Defendant's ability to do, each buyer has the contractual right to cancel the purchase agreement and obtain a full refund of all deposits previously paid. *See* Exhibit "A", pg 6, to Lobanov Affidavit. In such event, Defendant will suffer irreparable harm.

4.      As background to the instant motion, Plaintiff alleges that it "loaned" a total of $500,000 to Defendant. According to Plaintiff, it entered into a Loan Agreement with Defendant, which alleged Loan Agreement is evidenced by an unrecorded and unsecured Promissory Note. In its pleadings, Defendant avers that the $500,000 at issue did not belong to Plaintiff. An intervention has been filed in the instant action by Maria Kuzmina who alleges that at the time relevant hereto, the $500,000 at issue belonged to her, and that under the facts of this case, Plaintiff has no rights to these funds whatsoever.

5.      On September 18, 2017, Plaintiff, together with Le Jardin Residences Manager, LLC, its manager, filed their Complaint against Defendant, and others, wherein they assert the following causes of action against Defendant:

      A.   Count I - breach of the Loan Agreement and Promissory Note, and

      B.   Count IV - Equitable Lien.

Count I seeks monetary damages from Defendant resulting from Defendant's alleged breach of the terms of the Loan Agreement and Promissory Note, and Count IV seeks the imposition of an equitable lien against Defendant's property to secure the damages alleged to flow from the purported breach. *See* Complaint and Exhibits "1" and "2" thereto.

6.      An affidavit by Alexey Burya subsequently filed in this action on June 1, 2018, states that Plaintiff is seeking purported damages, as of that date, in the amount of $628,288.96 plus attorneys' fees and costs.

7.      Approximately ten and one-half months after commencement of this action, on July 31, 2018, Plaintiff recorded a  Lis Pendens against Defendant's Le Jardin Residences property.  The Lis Pendens purports to put all interested persons on notice that Plaintiff is seeking to enforce an interest in the property arising out its claims "seeking to establish and foreclose an Equitable Lien" as more fully set forth in the Complaint. *See* Notice of Lis Pendens attached hereto as Exhibit "B".

8.      Insomuch as Plaintiff's equitable lien claim is not founded on a duly recorded instrument or a claim of lien under Chapter 713, Part I, Florida Statutes, the duration of a notice of lis pendens is governed by section 48.23(2), Florida Statutes, which provides, in relevant part,

that "except when the court extends the time on reasonable notice and for good cause", Plaintiff's Lis Pendens is not effective "for any purpose beyond one year from the commencement of [this] action".

9.     In that Plaintiff had neither sought nor received an extension of the statutory duration of its Lis Pendens prior to the passage of one year from the commencement of this action, the Lis Pendens expired, as a matter of law pursuant to the governing statute, on September 18, 2018.

10.     In light of the immediacy of the anticipated issuance of the Temporary Certificate of Occupancy, to be immediately followed by closings on the 20 units under contract, on April 9, 2019, Defendant filed its Emergency Motion to Dissolve a Notice of Lis Pendens That Expired As A Matter of Law A Year After Commencement of This Action (the "Emergency Motion") in that the Lis Pendens would prevent its ability to deliver good title.

11.     On April 12, 2019, and in apparent response to the Emergency Motion, Plaintiff filed a Motion for Extension of Time Re Lis Pendens (the "Motion for Extension") wherein it sought an extension of the duration of the previously expired Lis Pendens.

12.     Defendant sought to have its Emergency Motion and Plaintiff's Motion for Extension heard on April 16, 2019, at a scheduled Case Management Conference; however, without considering the merits of the motions, the Court determined that an evidentiary hearing was required and entered its Order so ruling, and dismissing the Emergency Motion without prejudice. *See* Order dated April 16, 2019 attached hereto as Exhibit "C".

13.     In that Judge Lopez is unable to accommodate the emergency nature of the Emergency Motion due to an ongoing tobacco trial, Defendant requested and received permission from Judge Lopez to seek to have this matter heard on an emergency basis by one of

the backup judges.  *See* transcript of April 16, 2019 Case Management Conference, pg22 ln8-13 and pg23 ln7-13, attached as Exhibit "D".

14.     The Emergency Motion having been denied, without prejudice, Defendant files the instant Amended Emergency Motion to Dissolve Lis Pendens.

15.     Section 48.23(3), Florida Statutes, provides that when an initial pleading does not show that the action is founded on a duly recorded instrument or on a lien claimed under Part 1 of Chapter 713, Florida Statutes, this Court may control and discharge the lis pendens as this Court may grant and dissolve injunctions. [1]

16.     Since Plaintiff's Complaint is not founded on a duly recorded instrument, this Court has the discretion to consider discharge or extension of the Lis Pendens. *See Ortiz v. Weiss*, 227 So.3d 689, 691 (Fla. 3d DCA 2017); *Chiusolo v. Kennedy*, 614 So.2d 491, 492 (Fla. 1993); *Rodriguez v. Banco Indus. de Venezuela, C.A.*, 576 So.2d 870, 873 (Fla. 3d DCA 1991) ("When an action is not founded on a duly recorded instrument, the statute gives the trial court discretion to consider the extension and duration of the lis pendens on a case-by-case basis."); *Avalon Assocs. of Delaware Ltd. v. Avalon Park Assocs., Inc.*, 760 So.2d 1132, 1134 (Fla. 5th DCA 2000) (determining that, unless the initial pleading shows that the action is founded on a

---

[1]  Rule 1.610, Florida Rules of Civil Procedure, requires the posting of a bond to maintain a temporary injunction. Likewise, when a lis pendens is not predicated upon a duly recorded instrument or construction lien under Chapter 713, Florida Statutes, courts are required to consider whether the defendant against whom the lis pendens has been filed will likely incur damages and condition the plaintiff's right to maintain its lis pendens on the posting of a proper bond. *See Nobe Bay Holdings, LLC v. Garcia*, 140 So.3d 693, 695 (Fla. 3d DCA 2014) (holding that if the proponent of the lis pendens does establish a fair nexus, the trial court, within its discretion, can require the lis pendens proponent to post a bond to protect the property owner); Fla. R. Civ. P. 1.610 ("No temporary injunction shall be entered unless a bond is given by the movant in an amount the court deems proper,...").

5

duly recorded instrument, the court has the power to control the notice by discharging it, or requiring the party seeking to file a lis pendens to post a bond).

17.    In order to maintain a lis pendens predicated on an unrecorded document, the proponent must establish a fair nexus between the interest claimed in the property and the dispute embodied in the lawsuit. *See Von Mitschke-Collande v. Kramer*, 869 So.2d 1246, 1249 (Fla. 3DCA 2004)

18.    Plaintiff apparently contends that fair nexus exists simply by virtue of the fact that the Loan Agreement and Promissory Note which form the basis of its action against Defendant purport to require the funds provided thereunder to be used solely for the development and construction of the project on the property. *See* Complaint, ¶42.

19.    However, through its equitable lien claim, Plaintiff is seeking to have the Court decree that the property is security for monies purportedly advanced under the Loan Agreement and Promissory Note, when both documents **clearly** establish that "[t]he Loan will be unsecured". *See* Loan Agreement, attached to Complaint as Exhibit 1, at §6.1(d) and Promissory Note, attached to Complaint as Exhibit 2, at §7.a.  This undisputable fact alone establishes that fair nexus between Plaintiff's claim and the Defendant's property cannot be established, such that the Lis Pendens should be dissolved.  Plaintiff should not be allowed to do through the Lis Pendens that which it specifically agreed by contract not to do, *i.e.* use Defendant's property as security for the purported loan.

20.    While an equitable lien claim may support the recording of a lis pendens against real property, such claim must be predicated upon either (1) a written contract which evidences an intent to bind the property as security, or (2) circumstances which involve mistake, fraud or other misrepresentations of essential facts involving the property subject to the lis pendens. *See*

6

*Hallmark Mfg., Inc. v. Lujack Const. Co., Inc.*, 372 So.2d 520, 522 (Fla. 4DCA 1979).  Neither situation arises or is alleged in the instant action.

21.     The mere fact that a promise to pay, as set forth in the Loan Agreement and Promissory Note, may subsequently be broken does not give rise to a cause of action for equitable relief.  *Id.*  This is especially so when Plaintiff has an adequate remedy at law, as set forth in Count I, the absence of which is a necessary prerequisite for equitable relief.

22.     Without legal or equitable claim to the property, a lis pendens will not stand.  In a case with facts nearly identical to those in the present action, the Third District Court of Appeal reversed as error a trial court's ruling denying a motion to dissolve a lis pendens with instruction to the lower court to grant the motion dissolving the lis pendens.  *See Roger Homes Corp. v. Persant Constr. Co.*, 637 So. 2d 5 (Fla. 3DCA 1994).  Just like in the case at bar, in *Rogers Homes*, plaintiff Persant Construction Company relied "upon claims that arise from an unsecured and unrecorded promissory note, and from its action to impose and foreclose upon an equitable lien." *Id.* at 7.  The Third District Court of Appeal held that plaintiff was not entitled to maintain a lis pendens under Florida Statute 48.23 (based upon a breach of an unrecorded and unsecured promissory note claim) or under its equitable lien claim and, in so holding, made the following relevant legal determinations:

> This court has held that a claim for an equitable lien may support the imposition of a lis pendens. *Lakeview Townhomes at the Calif. Club Inc. v. Lakeview of the Calif. Cluyb Homewoners Ass'n, 579 So. 2d 290 (Fla. 3d DCA 1991)*.  However, in *Lakeview* the equitable lien itself was founded upon a duly recorded instrument – "the covenant running with the land executed by the defendant and recorded in the public [**4] records of Dade County, Florida." *579 So. 2d at 291*.  No such instrument exists in this case.  Furthermore, Persant is not entitled to a lis pendens based upon *section 48.23(3)*, which allows a court to "control and discharge the notice of lis pendens" as it would grant and dissolve injunctions.  To support its claim that there is no adequate remedy at law, Persant alleges only that "Plaintiff is informed and believes that Defendant's only asset is the real property described

herein," and does not allege that Roger Homes is insolvent. *See i.e., Architectonics, INc. v. Salem-American Ventures, INc., 350 So. 2d 581 (Fla. 2d DCA 1977)* (*HN4*[ ] allegation that obligor is insolvent may support claim that contractor is without [**5] adequate remedy at law and therefore may be entitled to equitable lien that would allow imposition of lis pendens), *Goldberg v. Banner Supply Co., 230 So.2d 714 (Fla. 3d DCA 1970)* (same).

*(Roger Homes Corp. v. Persant Constr. Co.,* 637 So. 2d 5, 7 (Fla. 3d 1994).

23.    Just as in *Roger Homes,* Plaintiff is premising its equitable lien claim on an unrecorded and unsecured promissory note.  Similarly, Plaintiff has not, and cannot, allege that Defendant is insolvent such that Plaintiff has no adequate remedy at law.

24.    Even assuming that Plaintiff's equitable lien claim could serve as fair nexus to support the imposition of a lis pendens, the Lis Pendens has expired, as a matter of law.  While there is case law which allows a lis pendens to be extended upon motion made after the passage of one year from the commencement of the action, *e.g. Taylor v. Steckel*, 944 So.2d 494 (Fla. 3DCA 2006), such case law does not specifically address Defendant's argument that section 48.23, Florida Statutes, does not provide the basis for extending a lis pendens which has expired as a matter of law.  Not only does *Taylor,* and similar cases, not address this argument, but *Taylor* can be further distinguished by the fact that the plaintiff in *Taylor* sought an extension of its lis pendens "a little more than a year following commencement of this action", whereas Plaintiff did not file its Motion for Extension under more than six months after the Lis Pendens had expired.

25.    Assuming *arguendo* that the Court does have the authority to extend a previously expired lis pendens, it is still incumbent on the proponent of the lis pendens to establish not only fair nexus, which as noted above Plaintiff cannot do, but it must also demonstrate "good cause" for the requested extension. *See* §48.23(2), Florida States and *Florida West Realty Partners,*

*LLC v. MNDG Lake Trafford, LLC*, 975 So.2d 479, 481 (Fla. 2DCA 2007), *rev. denied* 973 S0.2d 1121 (Fla. 2007)

26.     In its Motion for Extension, Plaintiff does not address this "good cause" requirement.  The only basis that it presents for extending the Lis Pendens is to "to preserve the status quo until the matter can be tried."  Plaintiff has presented **nothing** to demonstrate the required "good cause" sufficient to support this Court reviving and extending the previously expired Lis Pendens.

27.     Noting that the statute does not define "good cause", the *Florida West* court analogizes it to time extensions generally, where the Supreme Court has defined "good cause" as "a substantial reason, one that affords a legal excuse, or a cause moving the court to its conclusion, not arbitrary or contrary to all the evidence, and not mere ignorance of law, hardship on petitioner, and reliance on [another's] advice." *Id.* at 481.

28.     Because of Plaintiff's own delays in obtaining a timely extension of its Lis Pendens, which has expired as a matter of law, Plaintiff cannot furnish the good cause necessary to revive the Lis Pendens and grant the extension.

29.     It is also axiomatic that "[w]hen the primary purpose of a lawsuit is to recover money damages and the action does not directly affect the title or right of possession of real property, the filing of a notice of lis pendens is not authorized." *See Deguzman v. Balsini*, 930 So.2d 752, 755 (Fla. 5DCA 2006).  This is the situation in the case at bar.

30.     It should also be noted that Plaintiff's Lis Pendens is defective, as a matter of law, because it fails to comply with the requirement that it include "the date and time of the institution of the action" on which it is premised given that the Lis Pendens was not filed contemporaneously with the Complaint.  *See* §48.23(c)(1)(b), Fla. Stat. and *Hotel Europe v.*

**NELSON MULLINS BROAD AND CASSEL**
One North Clematis Street, Suite 500 West Palm Beach, Florida 33401 561.832.3300

*Aouate*, 766 So. 2d 1149, 1151 (Fla. 3DCA 2000) (finding that plaintiff's failure to include in the notice of lis pendens that information required under F.S. 48.23(c) and failure to timely extend the expiration date of the lis pendens could not be remedied upon subsequent amendments of the lis pendens and untimely motions for extension of expiration of lis pendens).

31.     On the above bases, Defendant's Amended Emergency Motion should be granted with the entry of an order dissolving, of record, Plaintiff's Lis Pendens.

32.     In the alternative, if this Court determines that there is a fair nexus between the instant action and Plaintiff's claim to Defendant's property and that good cause has been shown, such that it ultimately agrees to extend the Lis Pendens, Defendant requests that this Court require Plaintiff to post a bond in an amount sufficient to cover Defendant's damages potentially suffered as a direct result of the Lis Pendens in the event that Plaintiff's equitable lien claim fails.

33.     The posting of a bond would be required under the circumstances, specifically, the pending closings on the sale of units at Le Jardin House which cannot occur due to Defendant's inability to deliver good title as a result of the Lis Pendens.

34.     In addition to the potential of lost sales, Defendant will also be subjected to incurring the costs of its ongoing ownership of the Property, which include property taxes and continued maintenance, and will be exposed to potential lawsuits for specific performance and damages by purchasers who could not close due to the Lis Pendens.

35.     Should this Court extend the Lis Pendens and deny Defendant's request for the posting of a bond, Defendant will incur additional damages as the Property continues to be unable to generate any income for Defendant.

WHEREFORE, Defendant respectfully moves this Court to (1) grant Defendant's Amended Emergency Motion and enter an order dissolving the Lis Pendens, (2) deny Plaintiff's

Motion to Extend Lis Pendens or, in the alternative, require the posting of a bond, (3) award its reasonable fees and costs associated with the prosecution of Defendant's Amended Emergency Motion and Plaintiff's Motion for Extension, and (4) for such other and further relief as this Court deems just and proper.

Respectfully submitted,

**NELSON MULLINS BROAD AND CASSEL**

*/s/ Mark F. Raymond, Esq.*
Mark F. Raymond, Esq.
Florida Bar No. 373397
mark.raymond@nelsonmullins.com
stacy.smith@nelsonmullins.com
Amy Steele Donner, Esq.
Florida Bar No. 184548
amy.steeledonner@nelsonmullins.com
janel.gonzalez@nelsonmullins.com
2 S. Biscayne Boulevard, 21st Floor
Miami, Florida 33131
Tel: 305.373.9425
Fax: 305.995.6384

and

*/s/ Thomas F. Munro, II, Esq.*
Thomas F. Munro II, Esq.
Florida Bar No. 0382027
thomas.munro@nelsonmullins.com
kathy.kavanaugh@nelsonmullins.com
One North Clematis Street, Suite 500
West Palm Beach, Florida 33401
Tel: 561.832.3300
Fax: 561.655.1109

*Counsel for Defendant Le Jardin House, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 22, 2019, a true and correct copy was filed via E-Portal and served to the following via email and/or U.S. Mail: **Victor K. Rones, Esq.,** Law

Offices of Victor K. Rones, P.A., Attorneys for Plaintiffs, 16105 N.E. 18th Avenue, North Miami

Beach, Florida [**law@victorkronespa.com**], Eric M. Sodhi, Sodhi Spoont PLLC, 3050 Biscayne

Blvd, Suite 904, Miami, Florida 33137-4294Miami, FL 33137-4294 [**eric@sodhispoont.com**],

James Gordon, Esq. [**jg@jgordonlegal.com**] and Roman Groysman, P.A., Defendants' Co-

Counsel, 401 East Las Olas Blvd, Suite 1400, Fort Lauderdale, Florida 33301

[**rg@groysmanlaw.com**]

By:    *Thomas F. Munro, II*
Thomas F. Munro, II, Esq.

# EXHIBIT A

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2017-022215 CA 01

LE JARDIN RESIDENCES LENDERS, LLC, LE JARDIN RESIDENCES MANAGER, LLC,

      Plaintiffs,

vs.

LE JARDIN HOUSE, LLC, MARIA KUZMINA and NADEZDA DANILOCHKINA,

Defendants

_____/

LE JARDIN CAPITAL, LLC
Intervenor/Third Party Plaintiff

vs.

CASE NO.: 2017-24531 CA 01
(Consolidated case)

LE JARDIN HOUSE, LLC
Third Party Defendant

_____/

## AFFIDAVIT OF TIM LOBANOV IN SUPPORT OF DEFENDANTS LE JARDIN HOUSE LLC.'S AMENDED EMERGENCY MOTION TO DISSOLVE LIS PENDENS OR IN THE ALTERNATIVE TO REQUIRE THAT PLAINTIFF POST A LIS PENDENS BOND

STATE OF FLORIDA        )
                        ) ss:
COUNTY OF MIAMI-DADE    )

      BEFORE ME, the undersigned authority, the undersigned TIM LOBANOV (herein "Affiant") personally appeared, who being first duly sworn upon oath, deposes and says that:

1.       My name is TIM LOBANOV and I am over the age of eighteen years of age.  I have personal knowledge of the facts within this affidavit and if called to testify as to these matters I would be fully competent to do so.

2.       I am the Managing Director of Verzasca Group, LLC.

3.       Verzasca Group, LLC, a Delaware limited liability company, is the project manager responsible for overseeing the construction of a 30 unit condominium project located at 1150 102nd Street in Bay Harbor Islands, FL 33154 also known as Le Jardin Residences.

4.       Le Jardin Residences is owned by Defendant Le Jardin House, LLC, a Delaware limited liability company.

5.       Currently a total of 22 of 30 condominium units in the Le Jardin Residences condominium have been sold.  The gross sales value of these 22 sold units is $15,542,266.  Le Jardin House, LLC received from purchasers of these units a total of $5,678,969 in deposits.

6.       The total gross market value of all 30 condominium units of Le Jardin Residences condominium is $22,924,351.

7.       We currently anticipate that a Temporary Certificate of Occupancy (a "TCO") for the Le Jardin Residences project will be issued by Friday April 26, 2019.

8.       Closings on the 22 condominium units which have already been sold are expected to commence Monday April 29, 2019 and will continue for the following 2 weeks until completed.

9.       The Lis Pendens that has been filed and recorded by the Plaintiff in Miami-Dade County Public records on Le Jardin Residence's property, unless dissolve, will make it impossible for these closing to take place.  Plaintiff's Lis Pendens, unless dissolved, will force

Le Jardin House, LLC to return to the buyer's $5,678,989 in deposits and will expose Le Jardin House LLC to potential lawsuits for specific performance and damages by these buyers.

10.    Attached hereto as Exhibit "A" is a true and accurate copy of one of the 22 binding contracts currently pending for the sale of condominium units by Defendant Le Jardin House, LLC.    This contract is representative of all currently pending contracts for the sale of condominium units at Le Jardin Residences.

FURTHER AFFIANT SAYETH NAUGHT

By: _____
            TIM LOBANOV

STATE OF FLORIDA                )
                                )  ss:
COUNTY OF Miami-Dade            )

            Sworn to and subscribed before me this ___18___ day of April, 2019, by TIM LOBANOV, who  is  _personally  known_  to  me  or  provided  _____  as identification.

Notary Public, State of Florida
Print Name: Matthew C Santiago
My Commission Expires: 02/04/2022

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER.  FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

Additionally, under certain circumstances more particularly described in Section 4, and provided that the Seller has posted "Alternative Assurances" with the Division of Florida Condominiums, Timeshares and Mobile Homes, Seller may use all of Buyer's deposits (including those equal to the initial 10% of the Purchase Price, as hereinafter defined).

In this Agreement (including all addenda or amendments hereto, collectively, the "Agreement" or the "Contract"), the term "Buyer" and/or "Purchaser" means or refers to the buyer or buyers listed below who have signed this Agreement.  The word "Seller" and/or "Developer" means or refers to Le Jardin House, LLC, a Delaware limited liability company and its successors and/or assigns.  If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or, if no definition of such word is given in this Agreement, then it shall have the meaning given to it in the Declaration (as defined in Section 1 of this Agreement).

| Buyer(s): | ████████████████████ |
| Address: | ██████████████ |

| City: | **Miami Beach** | State: | **FL** |
| Country: | **United States** | Zip Code: | ██████ |
| Home Phone: | | Office Phone: | |
| Tax I.D. No.: | | Fax. No.: | |
| E-Mail Address: | ███████████████████ | Cellular Phone No.: | █████████████ |

Purchase and Sale.  Buyer agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit **405** (collectively, if more than one, the "Unit") in the proposed **LE JARDIN HOUSE CONDOMINIUM** (the "Condominium").  The Unit and the Condominium are described in greater detail in this Agreement and the proposed Declaration of Condominium (the "Declaration") included as an exhibit in the Prospectus for the Condominium (together with the exhibits attached to such Prospectus, collectively, the "Condominium Documents").  Buyer acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a buyer, on or before the date of this Agreement.

The total purchase price for the Unit is **$670,000.00** (the "Purchase Price").  Buyer also agrees to pay the fees, costs, reimbursements and other sums required to be paid by Buyer pursuant to Section 11 below.  Buyer understands and agrees that the Purchase Price of the Unit is not based solely upon the size of the Unit, but is also based on a number of different factors, including, without limitation, current market conditions, the location of the Unit within the Building, the floor level of the Unit within the Building, ceiling heights within the Unit, and/or sizes of balconies, terraces and/or patios, and/or any other special appurtenant rights attached to the Unit.

| | | |
|---|---|---|
| Initial 20% Deposit | Upon Buyer's execution of this Agreement | $134,000.00 |
| Additional 20% Deposit | No later than 5 days after Seller gives notice to Buyer that Seller has commenced groundbreaking or other site work | $134,000.00 |
| Additional 10% Deposit | No later than 5 days after Seller gives notice to Buyer that the Building has been topped-off | $67,000.00 |
| Balance | At closing | $335,000.00 |
| Total Purchase Price | | $670,000.00 |

Buyer expressly understands and agrees that Seller reserves the right to use Buyer's deposits both up to, and in excess of ten percent (10%) of the Purchase Price of the Unit in order to fund a significant portion of construction and development of the Condominium, all in accordance with the provisions of Section 4 hereof and applicable Florida law.

Deposits may be made by personal check (subject to clearance), cashiers' check or wire transfer of Federal funds. **The balance due at closing must be paid by wire transfer of immediately available federal funds only.** All payments must be made in United States funds and all checks must be payable on a bank located in the United States. Even though Seller is not obligated to do so, if Seller accepts a deposit from Buyer drawn on a foreign bank and/or payable in a currency other than U.S. currency, Buyer shall be solely responsible for all costs of collection and/or conversion and agrees to pay same to Seller promptly upon demand or, in Seller's sole and absolute discretion, Seller may permit such costs to be charged to Buyer at the time of closing.  If Buyer fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Buyer will pay a late funding charge equal to interest on such deposit at the then applicable highest lawful rate from the date due until the date received by Seller and cleared by the bank on which it is drawn.  Buyer also agrees to pay all fees, costs, expenses and/or other sums required to be paid by Buyer in this Agreement.  At the present time, the costs for which dollar amounts can be computed are:

$5,862.50 - .875   ~~KS~~

(a)   ~~$11,725.00~~                     ~~1.75%~~ Development Fee

(b)   $2,594.00        -        Initial Contribution to the Condominium Association

These charges are subject to change as provided in Section 11 of this Agreement and are explained in more detail in that Section, as are other costs which cannot be computed at this time.

How Buyer Pays.  Buyer understands and agrees that Buyer will be obligated to pay "all cash" at closing and this Agreement is not contingent upon Buyer obtaining financing.  This Agreement and Buyer's obligations under this Agreement to purchase the Unit will not depend on whether or not Buyer qualifies for or obtains a mortgage from any lender.  Buyer will be solely responsible for making Buyer's own financial arrangements.

Although Seller does not have to do so, if Seller agrees to delay closing until Buyer's lender is ready, or to wait for funding from Buyer's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check (which Seller shall have no obligation to do), Buyer agrees to pay Seller a late funding charge equal to interest, at the then highest applicable lawful rate on all funds due Seller which have not then been paid to Seller (and, with regard to personal checks, which have not then cleared) from the date Seller originally scheduled closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance).  This late funding charge may be estimated and charged by Seller at closing.  Seller's estimate will be adjusted after closing based on actual funding and clearance dates upon either Seller's or Buyer's written request.  Without limiting the generality of Section 30 of this Agreement, the foregoing sentence will survive (continue to be effective after) closing.

Deposits.  Developer has entered into an escrow agreement (the "Escrow Agreement") with Fidelity National Title Insurance Company (the Escrow Agent"), with offices at 13800 N.W. 14th Street, Suite 190, Sunrise, Florida 33323, for the holding, disbursement and administration of Buyer's deposits, all in accordance with the terms of said Escrow Agreement, this Agreement and the Florida Condominium Act (the "Act").  A copy of the Escrow Agreement is included in the Condominium

Condominiums, ... as permitted by law, in lieu of holding deposits up to ten percent (10%) of the Purchase Price in escrow, Seller may cause the escrow agent to disburse such deposits to it for all uses permitted by law, all as more particularly described in the escrow agreement. If Seller has obtained such approval as of the date of this Agreement, a copy of the escrow agreement providing the mechanism for such disbursement has been delivered to Buyer. If such approval is obtained after the date of this Agreement, Buyer will be provided with a copy of the escrow agreement, but Buyer agrees that it shall not be deemed a material or adverse change in the offering of the Condominium by reason of the fact that Buyer has already agreed to the use of Buyer's deposits up to ten percent (10%) of the Purchase Price in the manner stated above. Accordingly, Buyer understands and agrees that Seller reserves the right to utilize all of Buyer's deposits (both up to, and in excess of, ten percent (10%) of the Purchase Price) as and to the extent permitted by law. Buyer should expect that its deposits up to, and in excess of ten percent (10%) of the Purchase Price will not remain in escrow.

At closing, all deposits not previously disbursed to Seller will be released to Seller. **Except where expressly provided herein to the contrary or otherwise required by law, all interest earned on Buyer's deposits shall accrue solely to the benefit of Seller. Interest shall not be credited against the Purchase Price of the Unit.** Buyer further understands and agrees that to the extent that deposit monies are removed from escrow and used as permitted herein, said monies are not available for investment and accordingly no interest shall be earned or deemed to be earned (even if Seller indirectly benefits from the use of said funds). No interest will be assumed to be earned, unless in fact said sums are invested in an interest bearing account and do in fact earn interest. Subject to the terms of Section 13 below, in the event of an uncured default by Buyer and the retention of the Deposit or any portion thereof by Seller, Seller shall also be entitled to retain any interest earned thereon. Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Buyer's deposits, or the portions thereof then being held in escrow, and any interest actually earned on them, may be transferred to the new escrow agent at Seller's direction. If Buyer so requests, Buyer may obtain a receipt for Buyer's deposits from the Escrow Agent.

_Buyer's Waiver and Subordination._ Seller may borrow (or may have borrowed) money from lenders (each, a "Developer's Lender") for the acquisition, development, refinancing and/or construction of the Condominium and/or Unit (and any other units owned by Seller, if any). Buyer agrees that any and each Developer's Lender will have, until closing, a mortgage on or other interest in the Unit, and the Condominium (or the real property upon which the Condominium will be created), with greater priority than any rights or interest Buyer may have therein, if any, pursuant to this Agreement or under any principal of equity or otherwise. At closing, Seller shall cause the then applicable mortgages to be released as an encumbrance against the Unit and may use Buyer's closing proceeds for such purpose. Without limiting the generality of the foregoing, Buyer's rights and interest under this Agreement (and the deposits made hereunder) will be subordinate to all mortgages, mezzanine and any other forms of financing (and all modifications made to those mortgages, mezzanine and any other forms of financing) affecting the Unit or the Condominium (or the real property upon which the Condominium is being developed) even if those mortgages, mezzanine and any other forms of financing provided by a Developer's Lender (or modifications) are made or recorded after the date of this Agreement. **Notwithstanding anything to the contrary contained in this Agreement, Buyer agrees that neither this Agreement, nor Buyer's making the Deposits (and/or Seller's use of deposits as permitted hereunder), will give Buyer any lien (equitable or otherwise) or claim against the Unit, the Condominium or the real property upon which the Condominium has been (or will be) created and Buyer knowingly, fully and unconditionally waives and releases any right to assert any such lien or claim.** Buyer hereby acknowledges and agrees that (i) any and each Developer's Lender is an express third party beneficiary of this Section 5, and (ii) this Section 5 and the rights of any and each Developer's Lender under this Section 5 shall survive any termination, rescission or other voiding of this Agreement, and any default by Developer under this Agreement.

_Insulation; Energy Efficiency._ Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Unit, the following insulation: (a) Polyguard Insulrap-50 on the Roof, having an R-Value of R-19 and a thickness averaging 3' 2", (b) Fiberglass Batt on the exterior walls, having an R-Value of R-4.8 and a thickness of 3/4" - 4", and (c) Fiberglass Batt on the interior demising walls having an R-Value of 4.8, and of varying thickness This R-value information is based solely on the information given by the appropriate manufacturers and Buyer agrees that Seller is not responsible for the manufacturers' errors. Pursuant to applicable law, Buyer shall have the option to obtain an energy efficiency rating on the Unit being purchased. Buyer hereby releases Seller from any responsibility or liability for the accuracy or level of the rating and Buyer understands and agrees that this Agreement is not contingent upon Buyer's approval of the rating, that the rating is solely for Buyer's own information and that Buyer will pay the total cost of obtaining the rating. All insulation and energy efficiency rating information is subject to Seller's general right, under Sections 14, 27 and 29 below to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

_Completion Date; Presale Contingency._ Seller estimates that it will substantially complete construction of the Unit, in the manner specified in this Agreement, by approximately June 30, 2017, subject, however, only to delays resulting from "Force Majeure" (the "Outside Date"). The term "Force Majeure" as used in this Agreement shall mean "Acts of God", labor disputes (whether lawful or not), work stoppages, material or labor shortages, restrictions or delays by any governmental or utility authority or any court of law, civil riots, floods or other causes beyond Seller's control.

Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right, in Seller's sole discretion, to rescind this Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least fifty percent (50%) of the Units in the Condominium. Seller must, however, notify Buyer of such a termination within one (1) year following the date of this Agreement (the "Contingency Expiration Date"). The foregoing presale contingency is a provision solely for the benefit of Seller, and may be waived unilaterally by Seller. Accordingly, Seller may elect to waive the contingency, whether or not the stated presales threshold has been met. In the event that Seller does elect to proceed without having met the threshold, Buyer will have no right to object thereto and shall remain bound by the

may terminate this Agreement if the Outside (Warranty) Expiration Date (this outside termination date) is not deemed a breach of Seller's obligation to use its good faith efforts to achieve the pre-sale requirement.

<u>Inspection Prior to Closing</u>.  Buyer will be given an opportunity prior to closing, on the date and at the time scheduled by Seller, to inspect the Unit with Seller's representative.  At that time, Buyer will sign an inspection statement listing any alleged defects in workmanship or materials (only within the boundaries of the Unit, itself) which Buyer discovers.  If any item listed is actually defective in workmanship or materials (keeping in mind the construction standards applicable in Miami-Dade County, Florida for properties of similar type, style and age), Seller shall, subject to the other provisions hereof, be obligated to repair those items at its cost within a reasonable period of time after closing, but Seller's obligation to do so will not be grounds for deferring the closing, nor for imposing any condition on closing.  **No escrows or holdbacks of closing funds will be permitted.**  Buyer understands and agrees that Seller's obligation to repair items in the Unit noted during the pre-closing inspection shall automatically terminate (with Seller having no further obligations for such items) upon the earlier of: (i) the date that Buyer obtains a permit for construction and/or improvement of the Unit, or (ii) the date that Buyer commences construction and/or improvement of the Unit, whether or not a permit has been obtained. If Buyer fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Seller will not be obligated to reschedule an inspection prior to closing and Buyer shall be deemed to have accepted the Unit in its AS-IS condition (subject only to any warranty obligations of Seller, to the extent applicable and not then expired).

From and after the closing, Buyer hereby grants Seller and its agents access to the Unit at reasonable times during normal business hours to complete any necessary repairs to the Unit.  If Buyer cannot be present at the time such work is to be performed to facilitate completion of such work, Buyer hereby authorizes Seller, its agents, employees contractors and sub-contractors to enter the Unit for such purposes using a master key or a key maintained by the Association.  If Buyer cannot or elects not to be present at the time that Seller performs any such work, Buyer hereby waives and releases Seller (its partners, members, managers, contractors, sub-contractors, employees, agents, designees and assigns) from any and all claims that Buyer may have against Seller (its partners, members, managers, contractors, sub-contractors, employees, agents, designees and assigns) relating to damage to or theft of property from the Unit that is not due to the negligence or intentional act of Seller or its partners, members, contractors, subcontractors, employees, agents, designees and/or assigns. Buyer acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives.  Buyer agrees not to interfere with or interrupt any workers at the site of the Unit.  No personal inspections (other than the one preclosing inspection referred to above) will be permitted.  Buyer may not commence any work on the Unit, other than prepaid options or extras that Seller agrees in writing to provide, until after closing.  Buyer recognizes that Seller is not obligated to agree to provide extras or options.  Buyer can examine Seller's Plans and Specifications at Seller's business office, located on site or otherwise at a location identified by the Seller, during regular business hours by making an appointment to do so in advance.

The provisions of this Section shall survive closing.

<u>Closing Date</u>.  Buyer understands and agrees that Seller has the right to schedule the date, time and place for closing, which shall in no event be scheduled later than six (6) months following the Outside Date.  Before Seller can require Buyer to close, however, two things must be done:

(a)     Seller must record the Declaration and related documents in the Miami-Dade County public records; and

(b)     Seller must obtain a temporary, partial or permanent certificate of occupancy for or covering the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be occupied), but, subject and subordinate to the provisions of Sections 0 and 32 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements and other portions of the Condominium Property need not then have certificates of occupancy, nor be completed.  Seller does, however, agree to complete those amenities within a reasonable period of time following closing, provided, however, that no closing shall occur until the certificate of substantial completion described in Section 718.104(4)(e), F.S. shall have first been recorded.  Seller does however, agree to provide or complete, within a reasonable period of time following closing, those roads and facilities for water, sewer, gas, electricity and recreational amenities, which Seller or its agents have represented Seller will provide or complete, or Seller has committed to provide or complete in accordance with the terms of the Condominium Documents.

Buyer will be given at least ten (10) days' notice of the date, time and place of closing.  Seller is authorized to postpone the closing for any reason and Buyer will close on the new date, time and place specified in a notice of postponement (as long as at least three (3) days' notice of the new date, time and place is given).  A change of time or place of closing only (one not involving a change of date) will not require any additional notice period.  Any formal notice of closing, postponement or rescheduling may be given by Seller orally, by telephone, e-mail, facsimile, mail or other reasonable means of communication at Seller's option.  All of these notices will be sent or directed to the address, or given by use of the information specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any change prior to the date the notice is given.  These notices will be effective on the date given or mailed (as appropriate).  An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.  After the notice is given or mailed, and if requested in writing by Buyer, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions.  This written confirmation is given merely as a courtesy and is not the formal notice to close.  Accordingly, it does not need to be received by any particular date prior to closing.  Buyer agrees, however, to follow all instructions given in any formal notice and written confirmation.  If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of mailing address, e-mail address, phone number or telecopy number, because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other

Closing. The term "closing" refers to the time when Seller delivers the deed to the Unit to Buyer and ownership changes hands. Buyer's ownership is referred to as "title". Seller promises that the title Buyer will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below and the other provisions of this Agreement). Notwithstanding that Buyer is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price and the transaction is governed by the Real Estate Settlement and Procedures Act (RESPA), Buyer shall have the right to obtain a title insurance commitment and policy for the title from its own sources rather than to receive same from Seller, or Buyer may elect to have Seller's closing agent issue the title insurance commitment and policy in accordance with terms set forth in Section 11 below. In the event that the transaction is governed by RESPA and Buyer elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller: (i) Buyer shall provide Seller with written notice of same within twenty (20) days following Buyer's execution of this Agreement (unless the estimated closing date is less than twenty (20) days following the date hereof, in which event, such notice must be given simultaneously with Buyer's execution of this Agreement); (ii) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Buyer; and (iii) Buyer shall, no later than five (5) business days prior to closing (or on the date of this Agreement, if the closing is scheduled less than five (5) business days following the date of this Agreement (the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Buyer), provided that if Buyer fails to give Seller written notice of defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

Unless Buyer has elected, in the manner specified above and if permitted to do so under the conditions set forth above, to obtain a title insurance commitment from its own sources (to the extent that the transaction is governed by RESPA), Buyer agrees that Seller's designee shall act as closing agent and shall issue the title insurance commitment (and subsequent title insurance policy), which shall be paid for by Seller as provided hereafter. Buyer will receive from Seller two (2) documents at closing which Buyer agrees to accept as proof that Buyer's title is as represented above:

A written commitment, from a title insurance company licensed in Florida, agreeing to issue a policy insuring title or the policy itself. This commitment (or policy) will list any exceptions to title. Permitted exceptions (exceptions which Buyer agrees to take title subject to) are:

(i)     Liability for all taxes or assessments affecting the Unit, which are not yet due and payable, starting the year Buyer receives title and continuing thereafter;

(ii)    All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements now or hereafter recorded in the public records, which may include, without limitation, zoning restrictions, property use limitations and obligations, easements (rightsofway) and agreements relating to telephone lines, water and sewer lines, storm water management and other utilities;

(iii)   The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded, now or at any time after the date of this Agreement, in the public records;

(iv)    Any open Notice of Commencement related to Seller's construction or development of, among other things, the Condominium (although Seller will provide an unsecured indemnification to the title insurer selected by Seller, on a form reasonably acceptable to Seller, to induce the title insurer selected by Seller to insure Buyer's title without exception for unfiled construction liens relating to the Notice of Commencement). To the extent that this transaction is governed by RESPA and Buyer elects to obtain title services through its own sources rather than from Seller's designee, Seller will only provide the title insurer selected by Buyer the same form of unsecured indemnification described above and Buyer assumes all obligations to obtain a title insurance commitment (and subsequent title insurance policy) without exception for unfiled construction liens, or otherwise, Buyer agrees to take title subject to the Notice of Commencement and any related unfiled liens;

(v)     Pending governmental liens as of closing (Seller will be responsible, however, for certified governmental liens or special assessment liens as of closing, provided, however, that to the extent that any such certified liens are then due or are payable in installments, Seller shall only be responsible for those payments and/or installments due prior to closing, and Buyer hereby assumes all payments and/or installments coming due after closing);

(vi)    All standard printed exceptions contained in an ALTA Owner's title insurance policy issued in Miami-Dade County, Florida; and

(vii)   Any matters not listed above as long as title insurance coverage is available for these matters from a nationally recognized title insurer.

A Special Warranty Deed. At closing, Seller promises to give Buyer a special warranty deed to the Unit. The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above.

Seller cannot provide the quality of the described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title.  If Seller cannot, after making reasonable efforts to do so (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments) correct the title defects, Buyer will have two options:

(i)    Buyer can accept title in the condition Seller offers it (with defects) and pay the full Purchase Price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit.  Buyer will not make any claims against Seller because of the defects; or

(ii)   Buyer can cancel this Agreement and receive a full refund of Buyer's deposits.

At the same time Buyer receives the special warranty deed, Buyer agrees to pay the balance of the Purchase Price and any additional amounts owed under this Agreement.  Seller has no obligation to accept funds other than as set forth in Section 3 above.  Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Buyer agrees Seller may unilaterally record in the Public Records of the County).  This Section shall survive (continue to be effective after) closing.

11.    Additional Fees and Costs.  Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing.  These include:

(a)    A "development fee" equal to one and three-quarters percent (1.75%) **.875%** of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price);

(b)    In the event of increases in either the recording fees imposed by the County, the documentary stamp tax rates or the promulgated title insurance premiums, subsequent to the date of this Agreement, or in the event of the imposition of any surcharge or any new governmental tax or charge on deeds or conveyances, Buyer agrees to pay all such increases, surcharges or new taxes or charges, in addition to the development fee;

(c)    To the extent that the transaction is governed by RESPA and Buyer has elected, in the manner provided herein, to obtain a title insurance commitment and policy from its own sources, or to the extent that Seller otherwise allows Buyer to utilize its own title agent (which Seller has no obligation to do if the transaction is not governed by RESPA) all costs in connection with title search, title review and the premium for the title insurance commitment and title insurance policy at the minimum promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home credits, if any);

(d)    A working capital contribution in an amount equal to the aggregate of twice the regular monthly assessment for the Unit due to the Association, as determined at the time of closing, and which contribution is payable directly to the Association to provide it with funds.  This contribution may be used by the Association for any purpose, including, payment of ordinary Common Expenses or operating costs, and will not be credited against regular assessments or charges. The amount of this contribution may change, however, if the monthly assessments change prior to closing (see Section 17).  To the extent that Seller elects to fund deficits as provided in the Declaration, no portion of the contribution shall be used for payment of Common Expenses prior to the expiration of the period during which Seller is excused from payment of assessments;

(e)    A reimbursement to Seller for any utility, cable or interactive communication deposits or hookup fees, and/or governmental impact fees, which Seller may have advanced prior to closing for the Unit or applicable to the Unit.  The amount of these charges is now unknown;

(f)    Any charge due for any options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Buyer and Seller;

(g)    Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating   the closing with Buyer and/or Buyer's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others. The amount of these charges is now unknown;

(h)    All fees and charges payable to any attorney selected by Buyer to represent Buyer.  The amount of any such charges is now unknown; and

The late funding charges provided for elsewhere in this Agreement, or any increases in items (i), (ii) or (iii) below, as provided below. The amount of any such charges is now unknown.

Seller agrees to pay the following closing costs at closing:

(i)    the costs of officially recording the deed in the Public Records of the County (presently, recording fees are $10.00 for the first page of an instrument and $8.50 for each additional page);

(ii)   documentary stamp taxes payable in connection with the deed conveying the Unit to Buyer (presently, documentary stamp taxes are $.60 for each $100.00 of consideration); and

(iii)  the title insurance premium for any title insurance policy issued by Seller's closing agent.  If the transaction is covered by RESPA and Buyer elects to have its own title agent issue the title insurance policy, or for any other reason, Buyer does not obtain a title policy from Seller's closing agent. Buyer shall be obligated for the payment of the title insurance premium

and agrees that the development fee is not for payment of closing costs or settlement services (other than to the extent expressly provided above), but rather represents additional funds to Seller which are principally intended to provide additional revenue and to cover various out-of-pocket and internal costs and expenses of Seller associated with the development of the Condominium.

If Buyer obtains a loan for any portion of the Purchase Price, Buyer will be obligated to pay any loan fees, closing costs, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Buyer a mortgage, if applicable. Additionally, if Buyer obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Buyer agrees to pay, in addition to any other sums described in this Agreement, such closing agent an aggregate sum equal to $975.00, for a simultaneously issued mortgagee's title insurance policy, the agent's title examination, title searching and closing services related to acting as "loan closing agent". In addition to that sum, Buyer shall be obligated to pay the premiums (at promulgated rate) for any title endorsements requested by Buyer's lender.   If the transaction is governed by RESPA, Buyer shall not be obligated to use Seller's closing agent as Buyer's loan closing agent, and if Buyer elects to use another agent, Buyer will not be obligated to pay to Seller's closing agent the amounts described in this paragraph (although Buyer will be obligated to pay to Buyer's loan closing agent such fees and expenses as are agreed to by Buyer and that closing agent).  Notwithstanding any of the references in this paragraph to Buyer obtaining a loan, nothing herein shall be deemed to make this Agreement, or the Buyer's obligations under this Agreement, conditional or contingent, in any manner, on the Buyer obtaining a loan to finance any portion of the Purchase Price; it being the agreement of the Buyer that the Buyer shall be obligated to close "all cash".

Current expenses of the Unit (for example, taxes and governmental assessments, levies and/or use fees and current monthly assessments of the Association and any interim service fees imposed by governmental authority) will be prorated between Buyer and Seller as of the date of closing.  Additionally, at closing, Buyer shall be obligated to prepay the next month's maintenance assessment to the Association.  This prepayment is in addition to Buyer's obligation to pay the working capital contribution, as described above.  If taxes for the year of closing are assessed on the Condominium as a whole, Buyer shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) from the date of closing through the end of the applicable calendar year of closing.  Buyer should understand that during the year in which the Declaration of Condominium is recorded, it is likely that real property taxes may be assessed as a whole against the entire property comprising the Condominium (rather than on a unit-by-unit basis, which is how the Condominium will be assessed during all years following the year during which the Declaration is recorded).  As such, if Buyer is closing in the calendar year during which the Declaration is recorded, Buyer should anticipate having to pay to Seller, at closing, the estimated prorated amount of real property taxes attributable to the Unit for the period from the date of closing through December 31 of the year of closing; and based upon the perceived value of the Unit, such amount will, in all likelihood, be a substantial sum.  If taxes for the year of closing are assessed on a unit-by-unit basis, Buyer and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Buyer responsible for paying the full amount of the tax bill and Seller reimbursing Buyer for Seller's prorated share of those taxes. Buyer agrees that Seller's prorated share of the taxes due as of closing need not be paid to Buyer, however, until the actual tax bill is presented to Seller; and any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party; provided, however, that any request for reproration is made within six (6) months following the issuance of the actual tax bill for the Unit (it being assumed, for purposes hereof, that tax bills are issued on November 1 of each tax year) or the date of the final determination of any property tax appeal (if the taxes for the year of proration have been appealed).  No request for proration made beyond the six (6) month period shall be valid or enforceable.  In addition, Buyer shall pay, or reimburse Seller if then paid, for any interim proprietary and/or general service fees imposed by any governmental municipality or governmental authority having jurisdiction over the Unit.  This Subsection shall survive (continue to be effective after) closing.

12.    Adjustments with the Association.  Buyer understands that Seller may advance money to the Association to permit it to pay for certain of its expenses (for example, but without limitation, insurance premiums, Common Element utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the Association and other similar expenses).   Seller is entitled to be reimbursed by the Association for all of these sums advanced by Seller, to the extent in excess of Seller's assessment obligations (and/or deficit funding obligations, if any).   To the extent that Seller is entitled to reimbursement, the Association will reimburse Seller out of regular assessments paid by Buyer and other owners as those contributions and assessments are collected, or as otherwise requested by Seller.   Seller also, at its election, may receive reimbursement (to the extent that it is otherwise entitled to reimbursement) for these payments by way of a credit against any sums it may become obligated to pay to the Association.

Default.

(a)    If Buyer fails to perform any of Buyer's obligations under this Agreement (including making scheduled deposits and other payments) Buyer will be in "default".  If Buyer is still in default ten (10) days after Seller sends Buyer written notice thereof, Seller shall be entitled to the remedies provided herein.  **If, however, Buyer's default is in failing to close on the scheduled date, then, in addition to all other remedies provided herein (if any), Seller can cancel this Agreement without giving Buyer any prior (or subsequent) notification or opportunity to close at a later date.**

(b)    Upon Buyer's default (and the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Seller can terminate this Agreement and resell the Unit for a higher or lower price. Buyer understands and agrees that Buyer's default will damage Seller, in part because of the following: (i) Seller has taken the Unit off the market for Buyer, (ii) Seller has relied upon use of Buyer's deposits to fund

against, is a fair and reasonable method for the calculation of Seller's damages. Until such time as the damages are capable of calculation pursuant to the Damage Determination Methodology (which Buyer understands and agrees may take several months or perhaps longer) Buyer agrees that any deposits or advance payments then being held in escrow shall remain in escrow and that any deposits and/or advance payments utilized in construction or development of the Condominium or properly withdrawn from escrow, need not be refunded to Buyer or returned to escrow. Buyer's agreement to the Damage Determination Methodology and the potential delay in calculation is a material consideration for Seller's willingness to enter into this Agreement. Buyer agrees that the Damage Determination Methodology is a fair and reasonable method for determination of Seller's damages, notwithstanding any delays associated with calculation and that this is not a liquidated damages provision. The "Damage Determination Methodology" shall be the sum of the following, with calculation to occur, at the request of either party, within thirty (30) days following Seller's closing on the sale of the Unit to another party (the "Resale").

(i)      The amount by which the Purchase Price on the Resale (the "Resale Purchase Price") is less than the Purchase Price under this Agreement. To the extent that the Resale Purchase Price exceeds the Purchase Price under this Agreement, for purposes of the Damage Determination Methodology, same shall result in a negative number that will offset the other considerations in determining damages. In the event that closing on the Resale has not occurred on or before one (1) year following the date that Seller receives temporary certificate of occupancy ("TCO") for the Unit, the Resale Purchase Price shall be deemed to be the same as the Purchase Price under this Agreement. Seller agrees to use its good faith efforts to resell the Unit at such price, on such conditions and otherwise in a like manner as that of other similarly situated units being offered for sale by the Seller in the Condominium. Plus;

(ii)     An amount equal to ten percent (10%) of the Resale Purchase Price, which is deemed to be a fair and accurate representation of the brokerage and marketing expenses likely to be incurred by Seller in marketing the Unit for resale; Plus

(iii)    An amount equal to interest on any unfunded deposits as of the date of Buyer's default, calculated at the rate of eight percent (8%) per annum on the unfunded portion of such deposits, from the date of Buyer's default until the date Seller receives a TCO for the Unit, and thereafter, an amount equal to interest on the unfunded portion of the Purchase Price of the Unit calculated at the rate of eight  percent (8%) per annum on the unfunded portion of the Purchase Price of the Unit, from the date Seller receives the TCO for the Unit (as hereinafter defined, the "TCO Date"), until the date of closing on the Resale, as applicable. In the event that closing on the Resale has not occurred on or before 1 year following the TCO Date, the date of closing on the Resale shall be deemed to be 1 year following the TCO Date. For purposes hereof, the TCO Date shall be the earlier of: (i) the date that Seller actually receives a TCO for the Unit or (ii) the Outside Date as defined in Section 7 above.

Notwithstanding anything to the contrary, Seller's Damages shall never be deemed to be less than zero (which could result if the Resale Purchase Price were greater than the Purchase Price).

Upon determination of Seller's damages in accordance with the Damage Determination Methodology ("Seller's Damages"): (a) if Seller's Damages are less than the amount of Buyer's deposits and other prepayments, then, Seller shall, within thirty (30) business days following the calculation of Seller's Damages, return to Buyer the amount by which Buyer's deposits and prepayments exceeded Seller's Damages, or (b) if Seller's Damages are greater than the amount of Buyer's deposits and other prepayments, then Buyer shall, within thirty (30) business days following the calculation of Seller's Damages, pay to Seller the amount by which Seller's Damages exceeded Buyer's deposits and prepayments. In either event, Buyer shall simultaneously deliver to Seller a full and complete release from any and all claims and/or liabilities arising out of, or in connection with, this Agreement.

Based upon the Damage Determination Methodology, Buyer understands and agrees that damages are incapable of calculation until the closing on the Resale has occurred (or is deemed to have occurred as stated above). As such, in the event of an uncured default by Buyer, Buyer agrees not to commence any legal or other action against Seller to attempt to obtain a refund of any deposits or other advance payments until such time as the Resale has occurred (or is deemed to have occurred). While this may result in an inconvenience to Buyer, Buyer understands and agrees that the Damage Determination Methodology is only applicable if and when Buyer defaults.

        **By initialing here, Buyer understands the unique Damage Determination Methodology agreed upon, that it may result in delays in calculation and that it is nonetheless a fair and reasonable method for determination of Seller's Damages resulting from Buyer's default.**

(c)      If Seller fails to perform any of Seller's obligations under this Agreement, Seller will be in "default". If Seller is still in default ten (10) days after Buyer sends Seller notice thereof (or such longer time as may reasonably be necessary to cure the default if same cannot be reasonably cured within ten (10) days), Buyer may pursue such rights as may be available in equity and/or under applicable law, and Seller is

response to such requirements. Any requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers or Seller's design professionals and/or contractors or suppliers. Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications". Without limiting Seller's general right to make changes, Buyer specifically agrees that the changes described above and changes in the location of utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, may be made by Seller in its discretion. In furtherance of the understanding and agreement stated above, Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs. These changes and adjustments are essential in order to permit all components of the Unit and the Building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner. Because of the foregoing, Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium. Buyer further acknowledges and agrees that (i) the plans and specifications for the Unit and the Condominium on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications; and (ii) because of the day-to-day nature of the changes described in this Section 14, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities). As a result of the foregoing, Buyer and Seller both acknowledge and agree that the Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities. Without limiting the generality of Section 29, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications. Seller has not given and Buyer has not relied on or bargained for any such warranties. In furtherance of the foregoing, in the event of any conflict between the actual construction of the Unit and/or the Building, and that which is set forth on the plans, Buyer agrees that the actual construction shall prevail and to accept the Unit and Building as actually constructed (in lieu of what is set forth on the plans).

Buyer understands and agrees that in designing the Condominium, the stairwells within the Condominium Property are intended primarily for ingress and egress in the event of emergency and, as such may be constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. Similarly, the garage and utility pipes serving the Condominium are intended primarily for functional purposes, and as such may be left unfinished without regard to the aesthetic appearance of same. Further, Buyer hereby acknowledges and agrees that the potential for sound and/or odor transmission in a multi-story building is always a possibility and that noises and/or odors from nearby units and/or mechanical equipment can often be detected in other units. Without limiting the generality of Section 29, Seller does not make any representation or warranty as to the level of sound and/or odor transmission between and among Units, vibrations from HVAC and/or mechanical equipment and the other portions of the Condominium Property, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from vibration, sound and/or odor transmission. Lastly, Buyer understands and agrees that there are various methods for calculating the square footage of a Unit and that depending on the method of calculation, actual square footage of the Unit may be more or less than Buyer had anticipated. Accordingly, during the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit. The agreements and waivers of Buyer contained in this Section 14 will survive (continue to be effective after) the closing.

<u>Certain Items and Materials</u>. Buyer understands and agrees that the Unit is to be delivered at closing in "decorator-ready condition". "Decorator ready condition" generally means that the Unit will be delivered in a condition where it is ready for decoration and finish by the Buyer after closing. Buyer understands and agrees that certain items such as the following, which may be seen in model apartments (if any), brochures and/or in illustrations, are not included with the sale of the Unit: wall coverings (including paint other than base primer), accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, sound systems, kitchen accessories, linens, window shades, security systems, certain built-in fixtures, cabinetry, carpets or other floor coverings and colors, wood trim, other upgraded items, balcony treatments (e.g., tile, stone, marble, brick, chattahoochee, scored concrete or wood trim), barbecues, planters, window screens, landscaping and any other items of this nature which may be added or deleted by Seller from time to time. This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed in model apartments (if any) or shown in illustrations strictly for the purpose of decoration and example only. Items such as these will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller. Certain of these items may not even be available. In the event that Seller does provide any of these or other items, however, Buyer agrees to accept them, although not requested by Buyer, as long as Buyer is not required to pay for such items. There is no obligation for Seller to provide models, but if so provided, the foregoing disclaimers will apply. Buyer further understands and agrees that certain items, if included with the Unit, such as tile, marble, stone, granite, cabinets, wood, stain, grout, wall and ceiling textures, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, or if Seller elects to omit certain items, Seller may modify the list of standard features or make substitutions for equipment, material, appliances, brands, models, etc., with items which in Seller's opinion are of equal or better quality (regardless of cost). Buyer also understands and agrees that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any). Buyer recognizes that certain colors as shown in displays or in the models, including, but not limited to, stone, marble, granite, cabinetry, carpeting and wood stain, will weather and fade and may not be duplicated precisely. If Seller allows Buyer to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within fourteen (14) days after the date the list of selections (if any) is made available to Buyer. If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood that the choices will be made by Seller in Seller's sole discretion.

SELLER AND BUYER, AND EACH OF THEIR HEIRS, SELLER, BUYER, OR ANY ASSIGNEE, SUCCESSOR, HEIR, OR LEGAL REPRESENTATIVE OF SELLER OR BUYER (ALL OF WHOM ARE HEREINAFTER REFERRED TO AS THE "PARTIES") SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDINGS, COUNTERCLAIM, OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE CONDOMINIUM DOCUMENTS, ANY RULES OR REGULATIONS OF THE ASSOCIATION, OR ANY INSTRUMENT EVIDENCING OR RELATING TO ANY OF THE FOREGOING, OR ANY DOCUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY ACTIONS, DEALINGS OR RELATIONSHIP BETWEEN OR AMONG THE PARTIES, OR ANY OF THEM. NONE OF THE PARTIES WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY NEGOTIATED BY THE PARTIES AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. SELLER HAS NOT IN ANY WAY INDICATED THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

This Section will survive (continue to be effective after) any termination of this Agreement, but shall otherwise be deemed merged into the deed at closing.

Maintenance Fee.  Buyer understands and agrees that the Estimated Operating Budget for the Association (the "Budget") contained in the Condominium Documents provides only an estimate of what it will cost to run the Association during the period of time stated in the Budget. The Budget is not guaranteed to accurately predict actual expenditures.  Actual expenditures may vary based upon a number of factors, many of which are out of Seller's control.  These factors include, without limitation, changes in costs, environmental considerations and the effects of natural disasters.  In making a decision to acquire the Unit, Buyer should factor in these potential increases in the Budget that may occur prior to closing, and after (and the resultant increases in the assessment amounts). While in Seller's opinion such changes do not constitute a material modification of the Condominium Documents in a manner which is adverse to the Buyer, nothing herein shall be deemed to deny Buyer the rights as set forth in Section 25 below.  It is intended that the Seller, as the sole Unit Owner upon the formation of the Condominium, will vote not to provide any reserves for the initial year of the Association.  Thereafter, on an annual basis, a majority of the Association's members (which may include the Seller/Developer during the second fiscal year of the Association) may vote to continue not to provide any reserves.  If an election is, in fact, made to waive reserves, the assessments per unit payable to the Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - Without Reserves".  If no such election is made, the assessments per Unit payable to the Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - With Reserves".

Condominium Association.  This Agreement is also Buyer's application for membership in the Association, which membership shall automatically take effect at closing.  At that time, Buyer agrees to accept all of the liabilities and obligations of membership.

Seller's Use of the Condominium Property.  As long as Seller owns a unit or units and is offering same for sale in the ordinary course of business, it and its agents are hereby given full right and authority to place and maintain on, in and about the Condominium Property and/or Association Property (excluding the Unit after closing) model units, sales and leasing offices, administrative offices, signs and lighting related to construction and sales promotion purposes, for such period of time, at such locations and in such forms as shall be determined by Seller in its sole and absolute discretion.  Seller, its employees, agents contractors, sub-contractors and prospective buyers are also hereby given, for construction and sales promotion purposes, the right of entry upon, ingress to, egress from and other use of the Condominium and/or Association Property (excluding the Unit after closing), and the right to restrict and regulate access to the Common Elements and/or Association Property, subject to Buyer's reasonable access to and from the Unit after closing, for the purposes of completing construction of the Common Elements, Association Property and/or other units within the Condominium.   Seller's salespeople can show units, the Association Property and/or the Common Elements, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell, resell, finance or lease units or other portions of any improvements to be constructed upon the Condominium Property or develop and manage the Condominium Property and/or Association Property and/or to provide management and administration and/or financial services, but Seller's use of the Condominium Property and/or Association Property must be reasonable, and cannot unreasonably interfere with Buyer's use and enjoyment of the Unit. This Section will survive (continue to be effective after) closing.

Sales Commissions.  Seller will pay all sales commissions due its in-house sales personnel and/or exclusive listing agent and the co-broker, if any, identified on the last page of this Agreement (if such space is left blank, it shall mean that Seller has not agreed to pay any co-broker and that Buyer represents that there is no co-broker who can claim by, through or under Buyer), provided that such co-broker has properly registered with Seller as a participating co-broker.   Seller has no responsibility to pay any sales commissions to any other broker or sales agent with whom Buyer has dealt.  Buyer will be solely responsible to pay any such other brokers.  By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement), nor has the sale been procured by any real estate broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement).  Buyer will defend, indemnify and hold Seller harmless for and from any such person or company claiming otherwise.  Buyer's indemnity and agreement to hold Seller harmless includes, without limitation, Buyer's obligation to pay or reimburse Seller for all commissions, damages and other sums for which Seller may be held liable and all attorneys' fees and court costs actually incurred by Seller (including those for appeals), regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately wins or loses.  This Section 20 will survive (continue to be effective after) closing and any termination of this Agreement.

Notices.  Whenever Buyer is required or desires to give notice to Seller, the notice must be in writing and it must be

Agreement, (iii) electronic transmission, or buyer has indicated an e-mail address on Page 1 of this Agreement; or (iv) hand delivery or by recognized overnight courier service (i.e., Fed Ex, Express Mail, United Parcel Service, etc.), to the address for Buyer set forth on Page 1 of this Agreement.

A change of address notice is effective when it is received. As to other notices, notices delivered by certified mail, shall be deemed received by Buyer on the date that the postal service first attempts delivery of the notice at the Buyer's address (regardless of whether delivery is accepted). Notices delivered by facsimile transmission shall be deemed received on the date that Seller gets confirmation (from the sending machine) that the facsimile was transmitted to the receiving facsimile number. Notices delivered by electronic transmission (e-mail) shall be deemed received by Buyer on the date sent by Seller. Notices delivered by hand delivery or overnight courier service shall be deemed received on the date that the delivery service or overnight courier service first attempts delivery of the notice at the Buyer's address (regardless of whether delivery is accepted). All permitted non-written notices to Buyer are deemed received on the date given by Seller.

Transfer or Assignment. Buyer shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable). To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever including, without limitation, charging an assignment or transfer fee and requiring full disclosure of any beneficial owners of any proposed assignee that is an entity. Any such assignee that is consented to by Seller must fully assume all of the obligations of Buyer hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. If Buyer is a corporation, partnership, other business entity, trustee or nominee, a direct or indirect transfer of any stock, voting interest, partnership interest, equity, beneficial or principal interest in Buyer will constitute an assignment of this Agreement requiring prior written consent by Seller. Without limiting the generality of the foregoing, Buyer shall not, prior to closing on title to the Unit, unless first obtaining the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion) advertise, market and/or list the Unit for lease, sale or resale, whether by placing an advertisement, listing the Unit with a broker, posting signs at the Unit or at the Condominium, allowing the Unit to be listed for sale on the internet or the Multiple Listing Service or otherwise. Notwithstanding any permitted assignment or transfer of any interest in this Agreement and/or the Unit, nothing shall relieve or release Buyer from any obligations or liabilities under the Agreement.

Others Bound by this Agreement. If Buyer dies or in any way loses legal control of Buyer's affairs, this Agreement will bind Buyer's heirs and personal representatives. If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving such interest. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity resulting from operation of law. If more than one person signs this Agreement as Buyer, each will be equally liable, on a joint and several basis, for full performance of all Buyer's duties and obligations under this Agreement and Seller can enforce this Agreement against either as individuals or together.

Public Records. Buyer authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Miami-Dade County, Florida. Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded by Buyer. **Buyer further agrees not to seek to impose any type of lien or other claim upon the Unit or all or any portion of the Condominium, equitable or otherwise, and any right to impose or seek any such lien or other claim is hereby knowingly, fully and unconditionally waived by Buyer.**

Buyer's Right to Cancel.

**THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING. FIGURES CONTAINED IN ANY BUDGET DELIVERED TO THE BUYER PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER. ACTUAL COSTS OF SUCH ITEMS MAY EXCEED THE ESTIMATED COSTS. SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.**

If Buyer does not cancel this Agreement during this 15-day period in the manner set forth above, it means that Buyer ratifies this Agreement and the Condominium Documents and Buyer agrees that their provisions are fair and reasonable in Buyer's opinion.

Florida Law; Severability. Any disputes that develop under this Agreement and any issues that arise regarding the entering into, validity and/or execution of this Agreement will be settled according to Florida law. If any part of this Agreement violates a provision of applicable law, the applicable law will control. In such case, however, the rest of this Agreement (not in violation) will remain in force.

Without limiting the generality of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions

without limiting generally of the foregoing or the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Buyer's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void. Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right).

Changes. Seller may make changes in the Condominium Documents in its sole discretion by providing Buyer with all such amendments that are made, provided that, as to these changes, Buyer will have fifteen (15) days from the date of receipt of such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Buyer in which to cancel this Agreement (by delivering written notice to Seller of such cancellation) and receive a refund of any deposits with applicable interest earned, if any. Buyer will not be permitted to prevent Seller from making any change it wishes in its sole discretion.

If Buyer has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Buyer, Buyer's failure to request cancellation in writing within the 15-day period will mean that Buyer accepts the change and waives irrevocably Buyer's right so to cancel. All rights of cancellation will terminate, if not sooner, then absolutely, at closing.

Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (i) substitute the final legal descriptions and asbuilt surveys for the proposed legal descriptions and plot plans contained in the Condominium Documents even though changes occur in the permitting stage and during construction, and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall Common Elements in any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected and/or (iii) update the Condominium Documents to reflect any changes in the Florida Condominium Act adopted by the Legislature (and/or changes to the Administrative Rules adopted by the Division) after the date of this Agreement. Buyer understands and agrees that Seller has no control over changes to the Act and/or Administrative Rules and as such, that Seller shall have no liability with respect to its incorporation of these changes.

The provisions of this Section 27 will survive (continue to be effective after) closing.

Nearby Activities and Views. Buyer understands and agrees that for some time in the future Buyer may be disturbed by the noise, commotion and other unpleasant effects of the nearby activities and that Buyer may be impeded in using portions of the Condominium Property by any one or more of those activities. Demolition or construction of buildings and other structures within the immediate area or within the view lines of any particular Unit or of any part of the Condominium (the "Views") may block, obstruct, shadow or otherwise affect Views, which may currently be visible from the Unit or from the Condominium.

As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter, except as is set forth herein or in the Condominium Documents. Buyer hereby agrees to release Seller, its partners and/or members and its and their officers, members, directors and employees and every affiliate and person related or affiliated in any way with any of them (collectively, "Seller's Affiliates") from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorneys' fees and costs, including those incurred through all arbitration and appellate proceedings, related to or arising out of any claim against the Seller or Seller's Affiliates related to Views or the disruption, noise, commotion, and other unpleasant effects of nearby development or construction, or from any other inconveniences, disturbances, obligations and/or liabilities resulting therefrom..

The provisions of this Section 28 shall survive (continue to be effective after) closing.

Disclaimer of Implied Warranties. All manufacturers' warranties will be passed through to Buyer at closing. At closing, Buyer will receive the statutory warranties imposed by the Florida Condominium Act (to the extent applicable and not yet expired). **To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Florida Condominium Act to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character, including, without limitation, any imposed by statute, ordinance or common law, are specifically disclaimed. Without limiting the generality of the foregoing, Seller hereby disclaims any and all express or implied warranties as to design, construction, view, wind, sound and/or odor transmission, furnishing and equipping of the Condominium Property, the existence of molds, mildew, spores, fungi and/or other toxins within the Condominium Property, except only those set forth in Section 718.203 of the Act, to the extent applicable and to the extent that same have not expired by their terms. Seller has not given and Buyer has not relied on or bargained for any such warranties. As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above). Buyer acknowledges and agrees that Seller does not guarantee, warrant or otherwise assure, and expressly disclaims, any right to views and/or natural light.**

engineers, from and against any and all liability or claims resulting from all matters addressed or disclaimed in this Section, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, inconvenience and/or personal injury and death to, or suffered by, Buyer or any of Buyer's Guests as defined below and any other person or any pets).   Buyer understands and agrees that neither Seller, Seller's Affiliates, nor any of Seller's third party consultants, including without limitation, Seller's architect, contractors and engineers, shall be responsible for any of the conditions described above, and Seller hereby disclaims any responsibility for same which may be experienced by Buyer, its pets, its family members and/or its or their guests, tenants and/or invitees (collectively "Buyer's Guests").

Further, given the climate and humid conditions in South Florida, molds, mildew, spores, fungi and/or other toxins may exist and/or develop within the Unit and/or the Condominium Property.   Buyer is hereby advised that certain molds, mildew, spores, fungi and/or other toxins may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk.   By executing and delivering this Agreement and closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, spores, fungi and/or other toxins and to have released and indemnified Seller, Seller's Affiliates and Seller's third party consultants, including without limitation, Seller's architect, contractors and engineers, from and against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, the inability to occupy the Unit, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities and/or personal injury and death to or suffered by Buyer and/or any of Buyer's Guests and any other person or any pets).   Without limiting the generality of the foregoing, leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of molds, mildew, fungus or spores.   Buyer understands and agrees that neither Seller, Seller's Affiliates, nor any of Seller's third party consultants, including without limitation, Seller's architect, contractors and engineers, shall be responsible, and Seller hereby disclaims any responsibility for any illness or allergic reactions which may be experienced by Buyer, and/or Buyer's Guests as a result of molds, mildew, fungus or spores.   It is solely the Buyer's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination.

This Section will survive (continue to be effective after) closing.

Return of Condominium Documents.   If this Agreement is canceled for any reason, Buyer will return to Seller all of the Condominium Documents delivered to him or her in the same condition received, reasonable wear and tear excepted.   If Buyer fails to return the Condominium Documents, Buyer agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

Survival.   Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed.   All other provisions shall be deemed merged into the deed.

32.   Substantial Completion.   The Unit will not be considered complete for purposes of this Agreement unless the Unit (and such portion of the Building intended to be used exclusively by Buyer) is physically habitable and usable for the purpose for which the Unit was purchased.   The Unit (and such portion of the Building intended to be used exclusively by Buyer) will be considered so useable if (i) the Unit is ready for occupancy and has all necessary and customary utilities extended to it and (ii) access to the Unit from a readily accessible entrance to the Building is complete or substantially complete.   The issuance of a temporary, partial or permanent certificate of occupancy for or covering the Unit from the proper governmental agency shall be deemed conclusive evidence that the Unit is considered complete for purposes of this Agreement.   Other units (and other portions of the Building, Common Elements and/or recreational facilities) may not necessarily be complete and/or useable.   As to any roads, sewers, water, gas or electric service or recreational amenities represented by Seller or its agents to be provided or completed by Seller, Seller agrees to provide or complete same within a reasonable period of time.

Disclosures.   Buyer is hereby advised as follows:

RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.   The foregoing notice is provided in order to comply with state law and is for informational purposes only. Seller does not conduct radon testing with respect to the Units or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium.

(b)   ANY CLAIMS FOR CONSTRUCTION DEFECTS ARE SUBJECT TO THE NOTICE AND CURE PROVISIONS OF CHAPTER 558, FLORIDA STATUTES.

(c)   BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE.   A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES.   IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

THIS HOME OR STRUCTURE IS LOCATED IN A COASTAL HIGH HAZARD AREA. IF THIS HOME OR STRUCTURE IS BELOW THE APPLICABLE FLOOD ELEVATION LEVEL AND IS SUBSTANTIALLY DAMAGED OR SUBSTANTIALLY IMPROVED, AS DEFINED IN CHAPTER 11C OF THE METROPOLITAN MIAMI-DADE COUNTY CODE, IT MAY, AMONG OTHER THINGS, BE REQUIRED TO BE RAISED TO THE APPLICABLE FLOOD ELEVATION LEVEL; and

THIS HOME OR STRUCTURE IS LOCATED IN A SPECIAL FLOOD HAZARD AREA. IF THIS HOME OR STRUCTURE IS BELOW THE APPLICABLE FLOOD ELEVATION LEVEL AND IS SUBSTANTIALLY DAMAGED OR SUBSTANTIALLY IMPROVED, AS DEFINED IN CHAPTER 11C OF THE METROPOLITAN MIAMI-DADE COUNTY CODE, IT MAY, AMONG OTHER THINGS, BE REQUIRED TO BE RAISED TO THE APPLICABLE FLOOD ELEVATION LEVEL.

(f)     Buyer further agrees not to seek to impose any type of lien or other claim upon the Unit, equitable or otherwise, and any right to impose or seek any such lien or other claim is hereby knowingly, fully and unconditionally waived by Buyer.

(g)     Buyer expressly understands and agrees that Seller intends to use Buyer's deposits (both up to (provided that Seller has placed Alternative Assurances approved by the Division), and in excess of 10% of the Purchase Price of the Unit) in order to fund a significant portion of construction and development of the Condominium, all in accordance with the provisions of Section 4 hereof and applicable Florida law.

(h)     In accordance with the ordinances of Miami-Dade County, Buyer is hereby advised that the Unit is or may be submetered, that bills for water service will or may be issued on a submetered basis, and that bills shall not include charges for water service for common areas and facilities (the charges for water service for common areas and facilities instead are included in Common Expenses and paid for through Assessments). Buyer acknowledges receipt of the County Consumer Service Department's Remetering Bill of Rights pamphlet.

Buyer's Initials to acknowledge the foregoing disclosure: 

34.     <u>Representations and Confirmations</u>.   Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any monetary or financial advantages.

Buyer acknowledges, warrants, represents and agrees that no statements or representations have been made by Seller, Seller's Affiliates, or any of its agents, employees or representatives with respect to (i) the ability or willingness of Seller or Seller's Affiliates to assist Buyer in renting or selling the Unit (except only in response to a direct inquiry from Buyer), (ii) the economic or tax benefits to be derived from the managerial efforts of a third party as a result of renting the Unit or other units, or (iii) the economic or tax benefits to be derived from ownership of the Unit.

Buyer acknowledges, warrants, represents and agrees that no such representations, including representations as to the ability or willingness of Seller or Seller's Affiliates to assist Buyer in financing, renting or selling the Unit, have been made by Seller, Seller's Affiliates, or any of its agents, employees or representatives. Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit.  Neither Seller, Seller's Affiliates, nor anyone working by, through or under Seller, has made any statement or suggestion that Buyer would not be obligated to fully comply with the terms of this Agreement and to close on the purchase of the Unit.  Further, Buyer understands and agrees that neither Seller, Seller's Affiliates, nor any brokerage company, on site sales personnel and/or other persons working by, through or under Seller, are under any obligation whatsoever to assist Buyer with any resale of the Unit.

**Buyer acknowledges, warrants, represents and agrees that Buyer has not relied upon any verbal representations or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) potential appreciation in or resale value of the Unit, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the Condominium, (d) disturbance from nearby properties, (e) disturbance from air or vehicular traffic or (f) any particular design professional, including, without limitation, any decorator or architect (it being understood that the Seller reserves the right to change and/or replace any and all members of its design team at any time, in Seller's discretion).**

The provisions of this Section shall survive the closing.

<u>Offer</u>.  The submission by Seller of this Agreement to Buyer for examination does not constitute an offer by Seller to Buyer, or a reservation of or option for any Unit in the Condominium.  This Agreement shall not become binding until executed and delivered by both Buyer and Seller.  Upon execution by Seller, an executed copy of this Agreement shall be sent to Buyer or Seller shall otherwise demonstrate its acceptance of Buyer's offer, otherwise the offer shall be considered rejected.

<u>Interpretation</u>.  Notwithstanding that this Agreement was prepared by one party hereto, it shall not be construed more

to communicate any such change requested from all changes to Seller's management, which has agreed to give the opportunity to discuss and negotiate such changes.

37.  Risk of Loss.  Risk of loss to the Unit or Condominium by fire, natural disaster, acts of terrorism or other casualty until the closing is assumed by the Seller.  Risk of loss to the Unit by fire, natural disaster, acts of terrorism or other casualty from and after closing is assumed by the Buyer. Buyer should be aware that the Unit and Condominium, however constructed, may be subject to damage or destruction by naturally occurring events such as hurricanes, erosion and/or sinkholes.

Miscellaneous.  The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here.  When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Buyer and Seller.  Buyer acknowledges that the primary inducement for Buyer to purchase under this Agreement is the Unit, itself, and not the recreational amenities and other Common Elements. Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances. The performance of all obligations by Buyer on the precise times stated in this Agreement is of absolute importance and failure of Buyer to so perform on time is a default, time being of the essence as to all of Buyer's obligations hereunder. Buyer understands and agrees that Buyer is not acquiring rights in and/or to the name of the Condominium and/or the Condominium Association and that the name of the Condominium is not a material consideration in connection with Buyer's purchase of the Unit.  Additionally, the name of the Condominium and/or the Condominium Association may be changed by the Seller, in its sole discretion.  If Buyer tenders a check to Seller as all or a portion of the Purchase Price or Buyer's deposits under the Agreement (which Seller has no obligation to accept), which check was drawn on the account of a party other than Buyer (a "Third Party Check"), Buyer represents and warrants to Seller, in order to induce Seller to accept the Third Party Check, that: (i) the party issuing the Third Party Check is not the subject of a bankruptcy case, receivership or insolvency proceeding, (ii) the Third Party Check is being given on behalf of Buyer as reasonably equivalent value for services performed and/or products delivered to such third party from Buyer and (iii) the party issuing the Third Party Check has no right, title or interest in and to the Unit and/or the Agreement and/or any portion of the Deposits.  Notwithstanding the foregoing or anything contained to the contrary in the Agreement, Buyer shall remain responsible for full payment of the Purchase Price at closing, including without limitation, the Deposits.  Seller shall have the right to litigate ad valorem tax matters, impact charges, service fees and interim and/or special assessments concerning the Unit, the Common Elements or any other portion of the Condominium Property for prior years and/or the year of closing.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and said counterparts shall constitute but one and the same instrument.  Signatures of the parties hereto on copies of this Agreement transmitted by facsimile machine or over the Internet, shall be deemed originals for all purposes hereunder, and shall be binding upon the parties hereto. The counterparts of this Agreement and all ancillary documents executed or delivered in connection with this Agreement may be executed and signed by electronic signature by any of the parties to this Agreement, and delivered by electronic or digital communications to any other party to this Agreement, and the receiving party may rely on the receipt of such document so executed and delivered by electronic or digital communications signed by electronic signature as if the original has been received. For the purposes of this Agreement, electronic signature means, without limitation, an electronic act or acknowledgement (e.g., clicking an "I Accept" or similar button), sound, symbol (digitized signature block), or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.  Executive Order 13224 restricts activities with entities, countries and persons (specifically designated nationals) set forth by the Office of Foreign Asset Control ("OFAC").  In order to check the OFAC list, Buyer must provide Seller with a government-issued identification card (for example, a driver's license, passport, or resident alien card).  To the extent Buyer's name (or to the extent Buyer is a corporation or other entity, any person or entity constituting a part of Buyer) matches a name or entity on any such OFAC list or publication, the transactions with Buyer contemplated under or in connection with this Agreement will be immediately suspended, and Buyer shall be reported as instructed by OFAC.  Seller reserves the right to establish prices for units in the Condominium.  Seller may, in Seller's sole discretion, increase or decrease the price or price per square foot for any unit, or any offered option, if any, at any time, or offer incentives for the sale of units.  Seller makes no representations or warranties that the price for the Unit or options in the Unit will be increased or decreased for other buyers of identical or similar units or options.  Seller also makes no representations or warranties that changes made or options, extras or upgrades chosen by Buyer will or will not increase or decrease the market value of the Unit, and Buyer understands and agrees that such upgrades and options, if any, may not increase the market value of the Unit.

Entire Agreement.  This Agreement is the entire agreement for sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by both Buyer and Seller which specifically states that it is amending this Agreement.  This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, brochures, artist renderings and other promotional materials contained in the sales office and/or the model suite are conceptual and are for promotional purposes only and may not be relied upon.  **Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement or the Condominium Documents, are void and have no effect.  Buyer acknowledges and agrees that Buyer has not relied on them.  Notwithstanding the foregoing, Seller shall not be excused from any liability under, or compliance with, the provisions of Section 718.506, Florida Statutes.**

Co-Broker Information:            (See Section 20 above, if the space for Co-Broker's name is left blank, it shall
                                  mean that Seller has not agreed to pay any co-broker)

Co-Broker's Name:

Co-Broker's Sales

Co-Broker's

Phone                    Fax
E-Mail                   Licens

Adendum #1 Attached. TW

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING
PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

SELLER:                                          BUYER:

Le Jardin House, LLC, a Delaware limited
liability company

By: _____

Authorized Representative                        Name: _____ Tracy Ann Wilson and or Assigns



                                                 Name: _____

Date of Acceptance: ___2/27/15___                Date of Signature: ___2-27-15___

**Name of Condominium:**     LE JARDIN HOUSE CONDOMINIUM

**Address of Condominium:**     1150-1160 102nd Street, Bay Harbor Islands, Florida 33154

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If an item does not apply, place "N/A" in the column.

| Document | Received | By Alternative Media |
|---|---|---|
| Prospectus Text | N/A | ✓ |
| Declaration of Condominium | N/A | ✓ |
| Articles of Incorporation | N/A | ✓ |
| Bylaws | N/A | ✓ |
| Estimated Operating Budget | N/A | ✓ |
| Form of Agreement for Sale or Lease | N/A | ✓ |
| Rules or Regulation | N/A | N/A |
| Covenants and Restrictions | N/A | N/A |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More Than One Year | N/A | N/A |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominiums (See §718.503(1)(b)7, F.S. and §718.504, F.S.) | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sales Brochure | N/A | N/A |
| Phase Development Description (See §718.503(1)(b)11, F.S. and §718.504, F.S.) | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums (See §718.503(1)(b)8, F.S. and §718.504, F.S.) | N/A | N/A |
| Description of Management for Single Management of Multiple Condominiums (See §718.503(1)(b)5, F.S. and §718.504, F.S.) | N/A | |
| Conversion Inspection Report | N/A | N/A |
| Conversion Termite Inspection Report | N/A | N/A |
| Document | Received | By Alternative Media |
| Plot Plan | N/A | ✓ |
| Floor Plan | N/A | ✓ |
| Survey of Land and Graphic Description of Improvements | N/A | ✓ |
| Frequently Asked Questions and Answers Sheet | N/A | ✓ |

| Document | Received | Made Available | By Alternative Media |
|---|---|---|---|
| Plans and Specifications | N/A | ✓ | N/A |

THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER.   THIS AGREEMENT IS ALSO VOIDABLE BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT.  BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED.  BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.

Executed this _27_ day of _Feb_____, 201_5_.

Purchaser or Lessee

_____
Name _____

_____
Name: _____

Additional Disclosure

Accompanying

Purchase Agreement



Carlos Alvarez, Mayor

Consumer Services Department
Office of the Director
140 West Flagler Street, Suite 903
Miami, Florida 33130-1561
T 305-375-1250   F 305-372-6308
consumer@miamidade.gov
www.miamidade.gov/csd

miamidade.gov

## REMETERING CONSUMER BILL OF RIGHTS

Water remetering is permitted in Miami-Dade County. The intent of this program is to conserve water, assist property owners in detecting and correcting water leaks in a timely manner, and ensure that you do not unfairly pay for water used by others.

Miami-Dade County Ordinance 96-137 permits owners of condominiums, apartment buildings, commercial complexes, mobile home parks, etc. to install a submeter in each individual's unit. As a result, you pay for your own water service consumption in addition to your monthly rental or maintenance fee.

This is a summary of your rights and responsibilities under the rules:

**Bills in General:**
Your bill may only cover water and sewer from within your unit, as measured by your unit's water meter. Water and sewer consumption for common areas and facilities such as community pools are the responsibility of the property owner. The property owner cannot disconnect your water service and cannot bill you for usage of water service by previous resident.

**What your bill must show:**
Your bill must show all of the following information:

1. The date and meter reading of the period for which the bill is rendered.

2. The prior and current meter readings.

3. The total gallon or CCF of water service being billed and how it has been computed.

4. The total amount due for water service used and applicable taxes.

5. The name and address of the resident to whom the bill is issued.

6. The name of the company providing you with the bill and the address and telephone number of the contact person you can call in case of a billing dispute.

7. The bill due date.

8. The name, address and telephone number of the party to whom payment is to be made.

9. If your bill has been estimated, it must state that it has been estimated.

10. The telephone number of the Miami-Dade Consumer Services Department (CSD). (305) 375-3677, and a statement that indicates the CSD may be contacted if you are unable to settle your dispute with your property owner or remeterer.

**Due Date:**
You must be given at least 15 days to pay your bill. If your due date falls on a holiday or weekend, you may make your payment on the next business day after the due date.

**Late Payment Charge:**

If you pay your bill late, you may be charged a late fee not to exceed 10% of your total bill. It must be disclosed on your bill.

Additional Charges on Your Bill:
You cannot be billed any charges other than water, sewer, applicable taxes, and late fee charges provided that it is disclosed in the bill.

**Disputes:**

If a dispute arises concerning your bill or water service, you must inform your property owner, in writing, the specific reason for the dispute. Your property owner is required to investigate promptly and report the results to you in writing within 30 days.

Overbilling or under billing:
If your bill is found to be in error, a corrected bill must be issued and the property owner or remeterer must adjust your bill. If you were undercharged, you may be billed for the amount under billed for a period not to exceed six (6) months. If the under billing is $25 or more, the property owner must offer you a deferred payment plan option for the same length of time as that of the under billing.

**Test:**

If you feel that your water meter is defective, your property owner must, upon a reasonable written request from you, test the accuracy of your submeter. If you wish, you may watch the test, or you can send a representative. The test must be made during normal business hours (normally, Monday through Friday between the hours of 8:00 AM to 5:00 PM). If the meter test indicates that your water meter is accurate, you may be charged a reasonable testing and plumbing charge. If your meter is defective, no charge can be made to you for making the test.

**Records:**

Your property owner is required to keep the following records for 12 months:
1) the bill from WASD;
2) calculation for the billing;
3) all meter readings, resident billings and meter test results for the individual units.


**A COPY OF THE WATER REMETERING ORDINANCE 96-137 CAN BE OBTAINED FOR A NOMINAL FEE FROM THE MIAMI-DADE COUNTY CONSUMER SERVICES**

**FOR ASSISTANCE AND/OR COMPLAINT RESOLUTION CALL THE MIAMI-DADE CONSUMER SERVICES DEPARTMENT AT (305) 375-3677**

Jardin House Condominium ("Condominium") from Le Jardin House, LLC, a Delaware limited liability company ("Developer"), has elected to receive the Prospectus for the Condominium and the other documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a buyer or lessee (collectively, the Condominium Documents") on either a thumb drive, media card, tablet, or other portable computing device, application, CD, DVD, via e-mail or other electronic medium ("Alternative Media"), rather than receiving paper copies of same.

Developer has given Purchaser the option of receiving the Condominium Documents on paper, but by signing below, has elected to receive the Condominium Documents by Alternative Media. The Purchaser should not select Alternative Media unless the Purchaser will have the means to read the Condominium Documents before the expiration of the 15-day cancellation period described in the purchase agreement.

The system requirements necessary to view the Condominium Documents by Alternative Media are as follows:

Operating System:  Microsoft Windows XP or higher, including Vista, 7 or 8 or Apple's Mac OS x10.5 or higher

Memory:  256 MB of Ram
Hard Drive:  60 MB of available hard-disk space
Processor Speed:  Intel Core Duo 1.83 GHz or higher
Software:  Adobe Reader 5.0 or higher.
USB Port – USB 1.1 or higher
Display Resolution – 1024 x 768 pixels or higher
By signing below, Purchaser hereby elects to receive the Condominium Documents by Alternative Media.

Name:  ▮▮▮▮▮▮▮▮▮▮
Date:  1 2 - 2 7 - 1 5

Name:  _____
Date:  2/27/15

*MIA 184277384v1*

(Buyer)

concerning the property described as:

Purchase of the unit 405 at Le Jardin House Condominium

(the "Contract"). Buyer and Seller make the following terms and conditions part of the Contract:

Additional Contract terms:

Storage unit to be included with unit #405 at no additional expense. *Assigned # 106* *RT*

Extras: We expect these done at closing.

Flooring: Builder will install the client supplied flooring material for the unit and the balcony as part of the purchase price. Client will purchase materials and builder will install at their expense and to satisfactory inspection of client

Paint: Areas not designated by client will be painted white which builder will supply. Other designated areas of the Unit will be painted with paint and colors supplied by the client. Egg shell finish. This work will be completed at the expense of the builder to satisfactory inspection of the client

Parking: Builder will provide two separate parking spaces. Non tandem *Assigned # 31 and # 32* *RT*

Development Fee: This shall include title insurance and state doc stamps, and be reduced to $5,862.50 or .875%

*This Fee has been Reduced to $5,862.50 or .875% as per Page 2 of The contract.* *RT*

| Date: 02/27/2015 | Buyer: | |
| Date: | Buyer: | |
| Date: 02/27/15 | Seller: | DocuSigned by: |
| | | 83BB90354AA14F9... |
| Date: | Seller: | |

dotloop verified
07/27/15 9:58AM EST
KXO6-YMJ-K-UAER-TRHB

This form is available for use by the entire real estate industry and is not intended to identify the user as a REALTOR. REALTOR is a registered collective membership mark that may be used only by real estate licensees who are members of the National Association of REALTORS and who subscribe to its Code of Ethics.

The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of blank forms by any means including facsimile or computerized forms.

ACSP-2a   Rev. 6/94   ©1994 Florida Association of REALTORS®   All Rights Reserved  Licensed to dotloop, Inc. and

# EXHIBIT B

Filing # 75744998 E-Filed 07/31/2018 11:35:48 AM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

LE JARDIN RESIDENCES LENDERS,
LLC., LE JARDIN RESIDENCES
MANAGER, LLC,
      Plaintiffs

Vs.

LE JARDIN HOUSE, LLC, MARIA
KUZMINA and NADEZDA
DANILOCHKINA,
      Defendants

LE JARDIN CAPITAL, LLC
      Intervenor/Third Party Plaintiff

Vs.

LE JARDIN HOUSE, LLC
      Third Party Defendant

CIVIL DIVISION
CASE NO.: 2017-022215 CA 01
Consolidated with:
Case No.: 2017-24531 CA 01

NOTICE OF LIS PENDENS

YOU ARE NOTIFIED of the institution of this action by the Plaintiff, LE JARDIN RESIDENCES LENDERS, LLC., against you seeking to establish and foreclose an Equitable Lien on the following property located in Miami-Dade County, Florida:

All personal property and real property located at 1150 and 1160 101 Street, Bay Harbor Island, Florida 33154 (as well as all assets of the Defendant, Le Jardin House, LLC being operated by its Manager, Verzasca Management, LLC). The real property is further described as:

Lots 7 and 8, Block 6, BAY HARBOR ISLANDS, according to the plat thereof as recorded in Plat Book 46, Page 5, Pubic Records of Miami-Dade County, Florida. With Folio Nos: 13-2227-001-1310 and 13-2227-001-1320.

I HEREBY CERTIFY that a true and correct copy of the foregoing was provided thru the e-filing portal on this 31st day of July, 2018 unto Roman Groysman, Esquire, Law Offices of Roman Groysman, P.A., 401 East Las Olas Blvd., Suite 1400, Ft. Lauderdale, Florida 33301. (roman@groysmanlaw.com); and Gary W. Pollack, Esquire, and Bretton I. Pollack, Esquire, Pollack, Pollack & Kogan, LLC, Courthouse Tower, 44 West Flagler Street, Suite 2050, Miami, Florida 33130 (gary.pollack@ppkfirm.com; brett.pollack@ppkfirm.com).

Law Offices of Victor K. Rones, P.A.
16105 N.E. 18th Avenue
No. Miami Beach, Florida 33162
Phone: (305) 945-6522 - Email: Law@victorkronespa.com

By: _____
Victor K. Rones, Esquire
FBN: 245178

Page | 1

# EXHIBIT C

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO: 2017-2245 (Consolidated w/ 2017-24131)

Le Jardin Residence Loan
LLC et. al.

                    Plaintiff(s),

        vs.

Le Jardin Capital LLC et. al.

                    Defendant(s),

                                        ORDER
                                        ~~GRANTING/DENYING~~
                                        ~~PLAINTIFF'S/DEFENDANT'S~~
                                        Re
                                        Scheduling Order
                                        & Strike Lis Pendens

_____/

            THIS CAUSE having come on to be heard on April 16, 2019
on Plaintiff's/Defendant's Motion s
        for Scheduling Order & Strike Lis Pendens
_____

and the Court having heard arguments of counsel, and being otherwise advised in the premises, it is hereupon

            ORDERED AND ADJUDGED that said Motion be, and the same is hereby

1. All counsel appeared & all parties have been stipulated
as served. Discovery & Motions shall proceed in due course.
All Defendants sought to be added by TT (other than Le Jardin
House LLC, Kuzmina & Pawluchkowy) are dismissed.

2. Motion to Strike Lis Pendens shall be
special set for evidentiary hearing. Motion to dissolve
Lis Pendens denied without prejudice.

            DONE AND ORDERED in Chambers at Miami-Dade County, Florida this 16th

day of April                    2019

                                        CIRCUIT COURT JUDGE

                                        CONFORMED COPY
                                        APR 16 2019
                                        PETER R. LOPEZ
                                        CIRCUIT COURT JUDGE

                                        ORIGINAL

Copies furnished to: Counsel of Record

117_01-554  3/11

                                        JUDGE PETER R. LOPEZ

# EXHIBIT D

Judge Lopez
April 16, 2019

1            IN THE CIRCUIT COURT OF THE 11TH
             JUDICIAL CIRCUIT IN AND FOR
2            MIAMI-DADE COUNTY, FLORIDA

3            CASE NO.: 2017-022215-CA-01

4

LE JARDIN RESIDENCES LENDERS, LLC,
5 LE JARDIN RESIDENCES MANAGER, LLC,

6

         Plaintiffs,
7 vs.

8 LE JARDIN HOUSE, LLC,
MARIA KUZMINA & NADEZDA DANILOCHKINA,
9

         Defendants.
10 _____/

11 LE JARDIN CAPITAL, LLC,

12          Intervenor/Third-Party Plaintiff,

13 vs.

14 LE JARDIN HOUSE, LLC,

15 _____/

16

17

18          Transcript of proceedings had and taken in

19      the above-entitled matter, before Judge

20      Peter R. Lopez, at the Dade County

21      Courthouse, 73 West Flagler Street, Miami,

22      Florida, on Tuesday, April 16th, 2019

23      commencing at or about 9:00 a.m.

24

25

Judge Lopez
April 16, 2019                                                     2

```
 1    APPEARANCES:

 2    On behalf of the Plaintiff:
            LAW OFFICE OF VICTOR K. RONES, P.A.
 3          16105 NE 18th Avenue
            North Miami Beach, Florida  33162
 4          (305)945-6522
            BY: VICTOR K. RONES, ESQ.
 5          law@victgorkronespa.com

 6
      On behalf of Third-Part Plaintiff:
 7          SODHI SPOONT PLLC
            3050 Biscayne Boulevard, Suite 904
 8          Miami, Florida  33137
            (305)907-7573
 9          BY: JOSHUA SPOONT, ESQ.
            josh@sodhispoont.com
10

11    On behalf of the Defendant:
            LAW OFFICES OF ROMAN GROYSMAN, P.A.
12          401 East Las Olas Boulevard, Suite 1400
            Ft. Lauderdale, Florida  33301
13          (954)712-0505
            BY: ROMAN GROYSMAN, ESQ.
14          rg@groysmanlaw.com

15

16          LAW OFFICES OF JASON GORDON, P.A.
            3440 Hollywood Boulevard, Suite 415
17          Hollywood, Florida  33021
            (954)241-4207
18          BY: JASON GORDON, ESQ.
            jg@gordonlegal.com
19

20

21

22

23

24

25
```

1    evidentiary hearing.  Sorry gentlemen.  I'm

2    always available, but don't tell me the day

3    before that it's now suddenly an emergency.

4    Okay.  Good luck.

5         MR. SPOONT:  Thank you, Judge.

6         MR. RONES:  Thank you, Your Honor.

7         (There was a brief recess.)

8         MR. GROYSMAN:  Your Honor, I apologize.

9    We're back to you for permission to go before a

10   back up judge given you're not going to be

11   available until June.

12        THE COURT:  If one of my colleagues wishes

13   to hear it I don't have a problem with --

14        MR. GROYSMAN:  I apologize, Judge, for not

15   getting to you earlier, but before it wasn't an

16   emergency, now it is because they're about to

17   get a TCO on these condos.

18        THE COURT:  It didn't become an emergency

19   over night, Counsel.  You knew the construction

20   problems.  But again, I have no problems if any

21   of my colleagues have the time, wish to hear

22   it, I don't have a problem with them hearing

23   it.

24        MR. GROYSMAN:  And Counsel also said that

25   you wanted one hour.  Is that specific to you

Judge Lopez
April 16, 2019                                23

1    or can we negotiate amongst ourselves?

2         THE COURT:  You can negotiate whatever you

3    think you need and if you fall short, that's

4    fine, I know what I do, but I don't know when I

5    have an hour available, so --

6         MR. GROYSMAN:  June is what your --

7         THE COURT:  June then.  Your best shot is

8    to try to get one of my colleagues, you can

9    convince them on an emergency basis that they

10   need to hear you.  All right.  I'm in a tobacco

11   trial, they will understand that part, and if

12   they wish to hear the motion certainly they're

13   welcome to do so.

14        MR. GROYSMAN:  Thank you, Your Honor.

15        THE COURT:  You can do that.  Any of my --

16        MR. GROYSMAN:  I didn't see what you

17   signed.

18        THE COURT:  It says evidentiary hearing I

19   believe.

20        MR. GROYSMAN:  Motion to Dismiss.

21        THE COURT:  Lis pendens denied today.

22        MR. GROYSMAN:  Right.  Without prejudice.

23        THE COURT:  Of course.

24        MR. GROYSMAN:  May I write that in?

25        THE COURT:  You can, but he understands

**Exhibit "C"**

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO: 2017-022215 CA 01

LE JARDIN RESIDENCES LENDERS, LLC and
LE JARDIN RESIDENCES Manager, LLC

Plaintiff(s),

vs.

LE JARDIN House LLC, MARIA KUZMINA
and NADEZDA DANILOCHKINA

Defendant(s),

_____/

~~ORDER
GRANTING/DENYING
PLAINTIFF'S/DEFENDANT'S~~

THIS CAUSE having come on to be heard on  4/29/19
on Plaintiff's/Defendant's Motion
Defendant Le JARDIN HOUSE, LLC'S Amended Emergency
Motion to Dissolve Lis Pendens or to Require that Plaintiff Post A Lis
and the Court having heard arguments of counsel, and being otherwise advised in the premises, it is hereupon Pendens
Bond

**ORDERED AND ADJUDGED** that said Motion be, and the same is hereby

GRANTED. Plaintiff's Notice of Lis Pendens is hereby dissolved,
discharged and released and shall be of no further
effect for any purpose effective immediately. If Plaintiffs
take an appeal of this order they will be required
to post a bond in the amount of Sixteen Million
Dollars upon filing of the notice of Appeal.

**DONE AND ORDERED** in Chambers at Miami-Dade County, Florida this _____

day of ____Mai____ , ____2019____

_____
**CIRCUIT COURT JUDGE**

Copies furnished to: Counsel of Record

117_01-554  3/11

REEMBERTO DIAZ
CIRCUIT COURT JUDGE